Argued and submitted September 8, 1999, decision of Court of Appeals and order of circuit court affirmed May 16, 2002

Joy DELGADO,
*Respondent on Review,*

*and*

STATE OF OREGON,
*Respondent on Review,*

*v.*

ROBERT HUNTER SOUDERS,
*Petitioner on Review.*

(95-10330; CA A92188; SC S44163)

46 P3d 729

123-c

Chris W. Dunfield, Corvallis, argued the cause and filed the brief and additional authorities for petitioner on review.

Richard L. Wehmeyer, Corvallis, argued the cause for respondent on review Delgado.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent on review State of Oregon. With him on the briefs and additional authorities were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, and Riggs, Justices.**

CARSON, C. J.

---

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case. Kulongoski, J., resigned June 14, 2001, and did not participate in the consideration or decision of this case. De Muniz and Balmer, JJ., did not participate in the consideration or decision of this case.

**CARSON, C. J.**

This case involves ORS 30.866, set out *post*, the civil anti-stalking statute. The trial court entered a stalking protective order (SPO) under that statute, prohibiting defendant from knowingly following plaintiff, knowingly being in plaintiff's presence or within 100 feet of her residence, and from entering certain property. Defendant appealed, raising various constitutional challenges to ORS 30.866 and further arguing that there was not sufficient evidence to support entry of the SPO in his case. The Court of Appeals affirmed. *Delgado v. Souders*, 146 Or App 580, 934 P2d 1132 (1997). We affirm the Court of Appeals' decision and the trial court's order.

## FACTS AND PROCEDURAL BACKGROUND

The facts are as follows. In 1995, plaintiff was a student at Oregon State University (OSU) in Corvallis, working toward a doctoral degree in education administration. In the summer of 1995, plaintiff lived in an apartment about four blocks from the OSU campus and seven blocks from her office at the School of Education building, and she regularly walked to and from campus. During that summer, plaintiff noticed defendant several times a week, sometimes more than twice a day, either walking around plaintiff's apartment building or walking nearby as plaintiff walked to and from campus. She also noticed defendant a number of times in the OSU library when she was studying there. Initially, defendant's presence caused plaintiff no alarm or concern, although she began to notice defendant with increasing frequency and, on one occasion, noticed that defendant appeared to be looking in her direction.

One morning in late September 1995, when plaintiff was walking to campus, she heard leaves crunching behind her, turned, and saw defendant right behind her. Defendant passed by plaintiff within one or two feet and, in the course of passing by, crossed the street diagonally away from her. Plaintiff was startled and thought it strange that defendant had not said anything when he passed by her so suddenly, particularly because the area otherwise was deserted.

After that encounter, between September and November 1995, plaintiff noticed defendant on at least three occasions seated at tables near her study carrel in the basement of the OSU library. She ultimately stopped going to her study carrel, because defendant's presence made her uncomfortable. During the same time frame, plaintiff also noticed on a few occasions that defendant would appear on different floors of the library when she was working on those floors. On one or two of those occasions, she and defendant made "very, very brief" eye contact. By mid-November, plaintiff began to feel as if defendant were stalking her and became concerned for her personal safety.

In late November 1995, plaintiff was unloading her vehicle in the afternoon after returning home from a Thanksgiving trip. At that time, the street was quiet and deserted. When plaintiff locked and closed her vehicle door and turned around, she saw defendant about two or three feet away from her; he walked past her and, in the course of passing by, crossed the street diagonally away from her. Plaintiff began to feel more uncomfortable about defendant's conduct and became afraid and concerned for her personal safety. Consequently, she began documenting her encounters with defendant. One of plaintiff's concerns was the manner in which defendant "silently and swiftly" walked up behind her, without announcing—or without her otherwise noticing—his presence. Plaintiff also was concerned by the physically close nature of defendant's appearances, at times when no other people were nearby and when defendant was walking in a large, unobstructed area.

On December 1, 1995, during the late afternoon, plaintiff noticed defendant, from a distance, walking toward the School of Education building. At one point, defendant walked on the same side of the street as plaintiff; however, he turned and walked up a pathway near the building, and did not come into contact with plaintiff or otherwise give any indication that he was aware of her presence. Plaintiff again became concerned and afraid as a result of seeing defendant so frequently, particularly because, to plaintiff's knowledge, defendant neither worked nor attended classes at the School of Education building.

Shortly after noon the next day, plaintiff was walking between the School of Education building and the OSU computer center, at a time when the campus seemed deserted, when she sensed something behind her. Although she did not hear anything, she started to turn, and defendant was "right there," about one foot away. As plaintiff described it, defendant again had come up behind her swiftly, without any sound, and then passed by her. When defendant was about three feet ahead of plaintiff, plaintiff said "what the hell" to him, but he did not respond and kept walking forward. Later that day, plaintiff called the police, and, on December 7, 1995, plaintiff filed a civil stalking complaint[1] against defendant under ORS 30.866(1).

Later on December 7, 1995, an Oregon State Police (OSP) officer located defendant, handcuffed him, and transported him to the Public Safety Building on the OSU campus. An OSU public safety officer then issued defendant a notice, which is not at issue in this proceeding, declaring that he no longer was permitted on the OSU campus. On December 12, 1995, a trial court held an initial hearing on plaintiff's complaint and, after considering plaintiff's allegations, entered a temporary SPO against defendant under ORS 30.866(2). Soon thereafter, defendant moved to dismiss the complaint upon various constitutional grounds; the trial court denied that motion.

In February 1996, the trial court held an evidentiary hearing, pursuant to ORS 30.866(3)(a). Plaintiff testified about the encounters described above, adding that, throughout those encounters, defendant had not spoken to her, although he had made "side glances" in her direction when crossing the street and, on one or two occasions at the library, had made "very, very brief" eye contact. Plaintiff also presented evidence that she had suffered depression, anxiety, and "psychosocial stress" related to those encounters. Finally, plaintiff presented evidence that, in 1993, another female OSU student had obtained an SPO against defendant.

---

[1] Although ORS 30.866(2) refers to a "petition," plaintiff here filed a document entitled "Oregon Uniform Stalking *Complaint*." (Emphasis added.)

At the close of plaintiff's evidence, defendant moved to dismiss, based upon insufficient evidence. The trial court denied that motion, and defendant then presented his case. For his part, defendant testified that, like plaintiff, he lived within walking distance of the OSU campus and frequently used the OSU library as a resource for his work. Defendant noted that he used materials on different floors of the library and that he often read the newspapers in the basement.

Defendant further testified that he walked everywhere, that he would pass the School of Education building when walking from his apartment to the OSU library, and that he would pass plaintiff's apartment building when walking from his apartment to downtown Corvallis. Defendant testified that it was not unusual for him to walk by plaintiff's apartment building between four to eight times in one day. Defendant also described his manner of walking as "fairly fast" and stated that he regularly overtook other pedestrians on the sidewalk, giving no warning of his approach. Defendant further testified that he never remembered seeing plaintiff during the time period in question and that he did not know that plaintiff had complained about his conduct until he was transported to the Public Safety Building. Finally, other witnesses testified, in defendant's behalf, that defendant was a peaceful and truthful person, and that he walked quickly and "with a purpose," using long strides.

At the close of all the evidence, defendant renewed his pretrial motion to dismiss plaintiff's complaint, based upon various constitutional grounds. The trial court adhered to its earlier ruling and also concluded that plaintiff had established all the elements required to obtain an SPO under ORS 30.866(3)(a). The court then entered an order that prohibited defendant from knowingly following plaintiff or knowingly being in her presence; telephoning plaintiff; knowingly being in plaintiff's presence in the OSU library; knowingly being within 100 feet of plaintiff's residence; and entering the School of Education building or the OSU computer center.

As noted, defendant appealed. On appeal, the state intervened as a party. The Court of Appeals affirmed the trial

court's order. *Delgado*, 146 Or App 580. We allowed defendant's petition for review, which challenges ORS 30.866 upon various constitutional grounds and also raises issues related to the sufficiency of the evidence.

SUFFICIENCY OF EVIDENCE

We first address defendant's evidentiary challenge. *See State v. Montez*, 324 Or 343, 346, 927 P2d 64 (1996) (addressing subconstitutional issues before constitutional issues). As explained below, we conclude that plaintiff presented sufficient evidence to establish all the elements required to obtain an SPO under ORS 30.866(3)(a).

We begin by setting out the civil anti-stalking statute. ORS 30.866 provides, in part:

"(1) A person may bring a civil action in a circuit court for a court's stalking protective order or for damages, or both, against a person if:

"(a) The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person or a member of that person's immediate family or household thereby alarming or coercing the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household.

"(2) At the time the petition is filed, the court, upon a finding of probable cause based on the allegations in the petition, shall enter a temporary court's stalking protective order that may include, but is not limited to, all contact listed in ORS 163.730. The petition and the temporary order shall be served upon the respondent with an order requiring the respondent to personally appear before the court to show cause why the temporary order should not be continued for an indefinite period.

"(3)(a) At the hearing, whether or not the respondent appears, the court may * * * proceed to enter a court's stalking protective order * * *.

"(b) If respondent fails to appear after being served as required by subsection (2) of this section, the court may issue a warrant of arrest * * * in order to ensure the appearance of the respondent in court.

"(4) The plaintiff may recover:

"(a) Both special and general damages, including damages for emotional distress;

"(b) Punitive damages; and

"(c) Reasonable attorney fees and costs.

"* * * * *

"(7) Proof of the claim shall be by a preponderance of the evidence."

ORS 163.730 sets out a number of definitions that apply to ORS 30.866. That statute provides, in part:

"(1) 'Alarm' means to cause apprehension or fear resulting from the perception of danger.

"(2) 'Coerce' means to restrain, compel or dominate by force or threat.

"(3) 'Contact' includes but is not limited to:

"(a) Coming into the visual or physical presence of the other person;

"(b) Following the other person;

"(c) Waiting outside the home, property, place of work or school of the other person or of a member of that person's family or household;

"(d) Sending or making written or electronic[2] communications in any form to the other person;

"(e) Speaking with the other person by any means;

"(f) Communicating with the other person through a third person;

"(g) Committing a crime against the other person;

---

[2] The 2001 Legislature added the words "or electronic" to ORS 163.730(3)(d). Or Laws 2001, ch 870, § 1. Other than that amendment, the current version of ORS 163.730 is the same as it was at the time in 1995 when the contacts in question occurred.

"(h) Communicating with a third person who has some relationship to the other person with the intent of affecting the third person's relationship with the other person;

"(i) Communicating with business entities with the intent of affecting some right or interest of the other person;

"(j) Damaging the other person's home, property, place of work or school; or

"(k) Delivering directly or through a third person any object to the home, property, place of work or school of the other person.

"* * * * *

"(7) 'Repeated' means two or more times."

As noted above, defendant contends that plaintiff presented insufficient evidence to establish that defendant had engaged in stalking under ORS 30.866(1). Specifically, defendant complains that his conduct was too innocuous to establish, as a matter of law, that he had stalked plaintiff. Defendant further argues that plaintiff's sense of alarm was not objectively reasonable, as ORS 30.866(1)(b) requires.

We begin with defendant's contention that, regardless of the reasonableness of plaintiff's sense of alarm, plaintiff presented insufficient evidence as a matter of law to establish that his conduct constituted stalking. For purposes of our analysis, we focus upon the elements set out in ORS 30.866(1)(a):

"A person may bring a civil action * * * for a court's stalking protective order * * * against a person if:

"(a) *The person intentionally, knowingly or recklessly engages in repeated and unwanted contact with the other person* or a member of that person's immediate family or household thereby alarming or coercing the other person[.]"

(Emphasis added.) Among other things, ORS 163.730(3) defines "contact" as:

"(a) Coming into the visual or physical presence of the other person; [or] .

"(b) Following the other person[.]"

Defendant does not dispute that plaintiff sufficiently proved that, under the foregoing definition of "contact," he "engage[d] in repeated and unwanted contact," ORS 30.866(1)(a), with plaintiff. The gravamen of defendant's argument, rather, concerns the mental-state requirement set out in ORS 30.866(1)(a), that is, whether plaintiff proved that defendant acted with a necessary mental state respecting his contacts with her. That question, in turn, involves determining the extent to which the requisite mental states set out in ORS 30.866(1)(a) apply to the remaining parts of that statute.[3]

■ We begin by examining the text and context of ORS 30.866(1), to ascertain the legislature's intent. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993) (explaining methodology). As noted, ORS 30.866(1)(a) requires that a person accused of stalking in a civil proceeding "intentionally, knowingly or recklessly engage[ ] in repeated and unwanted contact with the other person * * * thereby alarming or coercing the other person." At the outset, we observe that the word "thereby," which denotes causation, precedes the words "alarming" and "coercing." Consequently, the text of ORS 30.866(1)(a) demonstrates that the legislature did not intend to require any culpability on a defendant's part respecting any alarm or coercion that the recipient of the contact experiences; rather, the terms "alarming" and "coercing" speak to the actual, subjective effect that a defendant's conduct has upon the recipient. *Compare* ORS 163.732(1) (crime of stalking requires that person "knowingly alarm[ ] or coerce[ ]" another person or member of that person's family or household).

The legislature did, however, impose a mental-state requirement in ORS 30.866(1)(a) respecting a defendant's conduct in *contacting* another person, by requiring that a defendant intentionally, knowingly, or recklessly "engage[ ]

---

[3] The state contends that defendant neither preserved that particular issue at trial nor raised it on appeal, and, accordingly, that this court should not address it. However, defendant thoroughly argued to the trial court and raised on appeal the issue whether plaintiff had presented sufficient evidence respecting the elements required to obtain an SPO under ORS 30.866(1), including evidence of his mental state *vis-à-vis* his conduct toward plaintiff. That issue necessarily raises the statutory construction question that we have identified.

in repeated and unwanted contact with the other person." The placement of the adverbs "intentionally," "knowingly," and "recklessly" immediately before the verb "engage[ ]" demonstrates that those words modify the verb "engage[ ]." Thus, the requisite mental states attach to the act of "engag[ing]" in the contact in question with the other person, such as coming into the visual or physical presence of that person, or following that person. *See* ORS 163.730(3)(a) and (b) (setting out those definitions of "contact," among others; referring to contact with "the other person").

We further observe that the adjectives "repeated" and "unwanted" modify the object "contact." Because those adjectives serve to describe the type of contact in which a defendant intentionally, knowingly, or recklessly must engage, we conclude from the text that a defendant must act intentionally, knowingly, or recklessly respecting the repeated and unwanted nature of the contacts in question.

██ The context of ORS 30.866(1)(a), which includes other related statutes, *PGE*, 317 Or at 611, helps to clarify the nature of the requisite mental states identified in that statute and how they apply to the described conduct. ORS 161.085 sets out the following definitions for purposes of the Oregon Criminal Code:[4]

> "(7) 'Intentionally' or 'with intent,' when used with respect to a result or to conduct described by a statute defining an offense, means that a person acts with a conscious objective to cause the result or to engage in the conduct so described.

---

[4] Although ORS 30.866 is not part of the Oregon Criminal Code, it has a criminal counterpart, ORS 163.738, which, together with ORS 163.744, provides for issuance of a criminal citation that ultimately could result in entry of an SPO by a court. ORS 163.738(2)(a)(B), which the legislature enacted as part of the same legislative package as ORS 30.866, *see* Or Laws 1993, ch 626, §§ 4, 9 (setting out legislation), sets out requirements for obtaining an SPO, following issuance of a criminal citation, that are identical to those set out in ORS 30.866(1), including the requirement that the defendant "intentionally, knowingly or recklessly engage[ ] in repeated and unwanted contact with the other person * * *." ORS 163.738(2)(a)(B)(i). In light of that criminal counterpart to ORS 30.866(1)(a), we conclude that, in enacting the civil statute in the same legislative package, the legislature intended the definitions set out in ORS 161.085(7) to (9) to apply to ORS 30.866(1)(a).

"(8) 'Knowingly' or 'with knowledge,' when used with respect to conduct or to a circumstance described by a statute defining an offense, means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists.

"(9) 'Recklessly,' when used with respect to a result or to a circumstance described by a statute defining an offense, means that a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

Applying those definitions to ORS 30.866(1)(a), we conclude that ORS 161.085(7) requires that a defendant act with a conscious objective to engage in repeated and unwanted contact with the other person; ORS 161.085(8) requires that a defendant act with an awareness that he or she is engaging in repeated and unwanted contact with that person; and ORS 161.085(9) requires that a defendant be aware of and then consciously disregard a substantial and unjustifiable risk that he or she is engaging in repeated and unwanted contact with that person, and the risk must be of such a degree that a reasonable person would not have disregarded it. Stated differently, at a minimum (that is, in the case of "recklessly"), a defendant subjectively must be aware of a substantial and unjustifiable risk that the contacts in question are repeated and unwanted by the recipient, and then consciously and unreasonably disregard that risk.

■■ That, in turn, demonstrates that ORS 30.866(1)(a) speaks to a defendant's mental state and actions with regard to a particular person—in other words, a defendant at least recklessly must direct his or her repeated and unwanted contacts toward a targeted, particular person. By contrast, a defendant who intentionally, knowingly, or recklessly places himself or herself in a particular location without any awareness of a substantial and unjustifiable risk that the contacts in question are repeated and unwanted by a particular person cannot be said to have acted with the minimal requisite mental state in respect of "contact[ing]" that person.

To summarize (particularly as applicable to this case): Under ORS 30.866(1)(a), plaintiff must have proved that, in at least two instances of coming into her visual or physical presence, defendant had been aware of a substantial and unjustifiable risk that she did not want defendant in her presence, and then consciously had disregarded that risk when a reasonable person would not have done so.

With that construction of ORS 30.866(1)(a) in mind, we turn to the facts of this case. We begin by making several observations regarding our standard of review. At the outset, we note that ORS 30.866 sets out a unique proceeding, in which a plaintiff files a civil action to obtain an SPO, the entry of which depends upon some standards common to the criminal law. *See* ORS 30.866(1) (identifying proceeding as "civil action"); ORS 30.866(1)(a) (setting out mental states of intentionally, knowingly, or recklessly); ORS 30.866(2) (setting out probable-cause standard for entering temporary civil SPO). Regardless of whether this case can be characterized as "civil" or "criminal," however, our standard of review respecting the challenged ruling on the evidentiary issue— specifically, the trial court's denial of defendant's motion to dismiss, at the close of plaintiff's case, based upon insufficient evidence—is the same, as the citations below demonstrate.

We first note that we must view the evidence in the record, and all reasonable inferences to be drawn therefrom, in favor of plaintiff, the nonmoving party. *See State v. Krummacher*, 269 Or 125, 137, 523 P2d 1009 (1974) (in deciding whether trial court erred in denying defendant's motion for judgment of acquittal, conflicts in evidence must be viewed in state's favor); *Anderson v. Sturm*, 209 Or 190, 191, 303 P2d 509 (1956) (in reviewing sufficiency of evidence on defendant's motion for nonsuit, court views evidence, and every reasonable inference to be drawn therefrom, in plaintiff's favor). Further, it is a question of law whether the evidence presented was sufficient to support the elements required to obtain an SPO. *See State v. Belt*, 325 Or 6, 11, 932 P2d 1177 (1997) (question of law whether evidence sufficient to support requisite element of criminal statute at issue); *State Farm v. Century Home*, 275 Or 97, 105, 550 P2d 1185 (1976) (same, regarding civil action). In evaluating plaintiff's evidence, we must determine whether she presented enough

evidence, as a matter of law, to permit reasonable persons to conclude that the evidence established each element by the requisite burden of proof (here, preponderance of the evidence). *See State v. Herrera*, 286 Or 349, 360, 594 P2d 823 (1979) (so stating, in context of submission of defense to jury in criminal case); *Pattle v. Wildish Construction Co.*, 270 Or 792, 798, 529 P2d 924 (1974) (so stating, in context of motion for nonsuit in civil case at close of plaintiff's evidence).

In reviewing the record, we also must be mindful that a party may establish an element of a criminal offense or a civil action by circumstantial evidence and reasonable inferences arising from such evidence. *See State v. Carson*, 292 Or 451, 461, 640 P2d 586 (1982) (jury entitled to review chain of circumstances to infer criminal defendant's mental state); *Lemons et al v. Holland et al*, 205 Or 163, 188, 284 P2d 1041 (1955) (element of civil action may be established by circumstantial evidence and reasonable inferences arising therefrom). However, as noted above, it is a legal question whether the evidence presented is sufficient to support a particular inference. *Belt*, 325 Or at 12.

Finally, in assessing such an inference, the question for this court is whether the evidence presented gives rise to a reasonable inference respecting an element in question or, depending upon the circumstances, whether a conflicting reasonable inference also can be drawn. *Id.*; *see also Lemons*, 205 Or at 188 (facts so established must be such that reasonable inference may be drawn regarding element in question).

As will be seen, this case turns upon the existence of evidence, including any reasonable inference to be drawn therefrom, tending to establish defendant's mental state *vis-à-vis* his contacts with plaintiff. We now turn to the record and apply the foregoing principles in that regard.

As discussed at the outset of this opinion, plaintiff presented evidence of three occasions in which defendant passed by her suddenly, silently, and swiftly, when no other people were nearby—once while plaintiff was walking to the OSU campus, once on the street in front of plaintiff's apartment building, and once on the OSU campus. On two of those occasions, upon reaching plaintiff and passing by her, defendant crossed the street diagonally away from her and made

"side glances" in her direction. In addition, the record shows that, on at least three occasions during the time period in question, defendant appeared in different parts of the OSU library when plaintiff was present. Finally, on one occasion, plaintiff noticed defendant, from a distance, walking toward the School of Education building. Those occurrences, taken together, took place over a three-month period, between late September and mid-December 1995.[5]

At the close of plaintiff's evidence, the trial court, without comment, denied defendant's motion to dismiss plaintiff's complaint. The question before us is whether plaintiff presented sufficient evidence, as a matter of law, to establish each element required to obtain an SPO under ORS 30.866(1).

For purposes of our analysis, we first note that, as to the contacts in the OSU library and the first occasion (in September 1995) when defendant passed by plaintiff closely while walking to campus, plaintiff did not present evidence that, at the time that they occurred, those contacts had caused her alarm or any reasonable apprehension for her personal safety. Rather, plaintiff testified that those contacts, which had occurred over about a two-month period, had caused her concern, in that she had begun noticing defendant more and more frequently in unexpected locations. Although those contacts—regardless of defendant's mental state at the time—cannot be said to satisfy all the elements of ORS 30.866(1), they do provide important contextual background respecting defendant's mental state during the contacts that occurred in November and December 1995, in which defendant again passed by plaintiff in a physically close manner.

Turning, then, to those two contacts, the record demonstrates that plaintiff presented sufficient evidence to establish both that those contacts subjectively had caused her alarm, ORS 30.866(1)(a), and that they had caused her to

---

[5] As noted earlier, plaintiff also had noticed defendant outside her apartment building and inside the OSU library on a number of occasions earlier in the summer of 1995. However, according to plaintiff's testimony, nothing about defendant's behavior at that time led her to think that those contacts were anything other than coincidental.

have reasonable apprehension regarding her personal safety, ORS 30.866(1)(c). We further conclude that, contrary to one of defendant's arguments on review, plaintiff's alarm was objectively reasonable under the circumstances. ORS 30.866(1)(b).

The remaining question is whether the evidence was sufficient as a matter of law to prove that defendant had acted with a requisite mental state regarding the two contacts in question. As explained earlier, ORS 30.866(1)(a) requires plaintiff to have proved that defendant at least recklessly had engaged in repeated and unwanted contact with her, by coming into her visual or physical presence. In other words, plaintiff must have proved that, in those two instances of coming into her presence, defendant subjectively had been aware of a substantial and unjustifiable risk that she did not want defendant in her presence and then consciously had disregarded that risk when a reasonable person would not have done so.

Because defendant never said anything to plaintiff or otherwise communicated with her in any way, and because plaintiff also did not vocalize to defendant in any way (until after he had passed by her a final time in December 1995) that his repeated presence was unwanted, we must infer his mental state in contacting plaintiff exclusively from his physical conduct. The following facts in that regard are significant: (1) defendant's close physical proximity to plaintiff (between one and three feet) when no other people were nearby and, on the occasion in November, when a large, unobstructed area was available to defendant; (2) on the occasion in November, defendant's crossing the street diagonally away from plaintiff immediately upon passing her and then making "side glances" in her direction; and (3) the fact that defendant had appeared in plaintiff's presence on numerous occasions in the preceding months, on one occasion passing by plaintiff in the same physically close manner and crossing the street diagonally away upon passing her, while glancing in her direction. In light of our standard of review—which requires that we draw all reasonable inferences in plaintiff's favor—we conclude that those facts support the reasonable inference that defendant was aware of and then consciously and unreasonably disregarded a substantial and

unjustifiable risk that, on two occasions, he had come into plaintiff's presence when she did not want the contacts. Stated differently, it reasonably can be inferred from defendant's conduct—namely, his passing by plaintiff swiftly and closely in deserted environments, and quickly crossing away upon reaching her and glancing in her direction—that he had targeted his contacts (albeit recklessly) toward this particular plaintiff.[6] Accordingly, the trial court did not err in denying defendant's motion to dismiss, at the close of plaintiff's case, based upon insufficient evidence.

Having rejected defendant's subconstitutional challenge, we turn to his constitutional challenges.

## APPLICABILITY OF CONSTITUTIONALLY REQUIRED SAFEGUARDS FOR CRIMINAL PROSECUTIONS

Defendant contends that, although ORS 30.866 creates a civil action for entry of an SPO, that statute in fact is criminal in nature, giving rise to various state and federal constitutional safeguards, including the right to a jury trial. In particular, defendant cites Article I, section 11, of the Oregon Constitution, which provides, in part:

> "In all *criminal prosecutions*, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor * * *."

(Emphasis added.)[7]

The state responds that ORS 30.866 is civil in nature and that, in any event, the procedure for entering an SPO

---

[6] We note that, as to the remaining contact that occurred on December 1, 1995, when plaintiff noticed defendant walking toward the School of Education building from a distance, nothing about defendant's conduct on that occasion suggests that he was aware of any risk that he had come into plaintiff's visual presence.

[7] Defendant also contends that entry of an SPO under ORS 30.866(3)(a) implicates the criminal protections set out in the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. However, his arguments concerning whether ORS 30.866 is civil or criminal in nature are confined to Article I, section 11, of the Oregon Constitution. Accordingly, we decline to consider his federal constitutional arguments on that issue.

under that statute is not the type of proceeding to which Article I, section 11, was intended to apply. For the reasons that follow, we agree with the state's latter contention.

■ At the outset, we note that the parties' disagreement about whether ORS 30.866 is a "civil" or "criminal" statute is based upon their respective applications of the criteria that this court identified in *Brown v. Multnomah County Dist. Ct.*, 280 Or 95, 570 P2d 52 (1977).[8] However, this court's case law demonstrates that, even if an ostensibly civil proceeding can be characterized as a criminal prosecution under *Brown*, an applicable historical exception to Article I, section 11, can exempt such a proceeding from the safeguards set out in that provision. For example, in *State ex rel Dwyer v. Dwyer*, 299 Or 108, 698 P2d 957 (1985), this court addressed the question whether a criminal contempt proceeding for violation of a child-support order implicated Article I, section 11. After determining that, under *Brown*, such a proceeding might be characterized as a criminal prosecution, the court reviewed the history of criminal contempt proceedings and concluded that, when the Oregon Constitution was adopted, it already was well established that such proceedings took place without jury trials. *Id.* at 112-14. The court, therefore, concluded that a statutorily required court finding on a criminal contempt charge

> "is wholly confined within an historical exception that was well-established when the Oregon constitutional guarantee of a jury trial in all criminal prosecutions was adopted, and the jury trial guarantee in Article I, section 11, demonstrably was not intended to reach punishment for indirect criminal contempt for violation of court orders to pay child support."

*Id.* at 114-15.

---

[8] In *Brown*, this court concluded that the following factors are relevant to the determination whether an "ostensibly civil penalty proceeding," 280 Or at 102, can be characterized as a "criminal prosecution[ ]" under Article I, section 11: (1) the type of offense at issue; (2) the prescribed penalty for the offense; (3) the collateral consequences that flow from the offense; (4) the punitive significance of the offense; and (5) the applicability to the offense of pretrial practices ordinarily used in the enforcement of criminal laws. *Id.* at 102-09. Applying those factors, the court in *Brown* concluded that the offense of driving under the influence of intoxicants gave rise to a "criminal prosecution[ ]" within the meaning of Article I, section 11. *Id.* at 109.

Similarly, in *State ex rel Hathaway v. Hart*, 300 Or 231, 708 P2d 1137 (1985), this court concluded that criminal contempt proceedings for restraining order violations under the Abuse Prevention Act fell within a historical exception to Article I, section 11. In so concluding, the court acknowledged that the framers of the Oregon Constitution could not have been aware of restraining orders under the Act, which was enacted in 1977. *Id.* at 240. However, the court determined that it could review the historical record "for analogies to restraining orders under the Act." *Id.* Based upon a historical exception for injunctions preventing spousal harassment, as well as the exception for criminal contempt proceedings discussed in *Dwyer*, the court in *Hathaway* concluded that the framers would have viewed restraining order proceedings under the Act as an exception to Article I, section 11, and, consequently, that no right to a jury trial applied. *Id.* at 241-42.

Consistent with *Dwyer* and *Hathaway*, we shall review the historical record to determine whether an SPO entered under ORS 30.866 falls within a historical exception to Article I, section 11. As in *Hathaway*, the framers of the Oregon Constitution cannot be said to have contemplated specifically the entry of an SPO, as the legislature did not enact the anti-stalking statutes as a whole until 1993. Here, however, the purpose of our inquiry is not to try to match historical facts; rather, our goal is to identify relevant principles that illuminate the matter at hand. *See generally State v. Delgado*, 298 Or 395, 692 P2d 610 (1984) (examining historical record to determine scope of framers' intent respecting types of weapons encompassed within constitutional right to bear arms).

To that end, we think it significant that, before statehood, the Statutes of Oregon provided for proceedings to prevent the commission of crimes. Under those statutes, upon receipt of a complaint of a threat to commit an offense against another person or another person's property, a magistrate could examine both the complainant and the accused person, as well as any potential witnesses. The accused person, in turn, had a statutory right to be assisted by counsel. Statutes of Oregon, Act to Define Crimes and Misdemeanors, and Regulate Criminal Proceedings, ch XVI, §§ 2, 4, 5 (1855). The

magistrate further could compel the appearance of the accused person, *id.* at § 3, and, upon a finding of "just cause to fear that any such offence will be committed" by the accused person, could require the accused person to enter into recognizance[9] with sufficient sureties, *id.* at § 6. However, the magistrate had no authority to order the accused person to appear before the district court, unless that person was charged with an offense within that court's jurisdiction. *Id.*

The statutory procedure set out in ORS 30.866 for entering an SPO mirrors the historical procedure for preventing the commission of a crime: A plaintiff files a petition in circuit court; the court compels the appearance of the defendant (and may issue a warrant if the defendant fails to appear); the court hears testimony from both sides; and, upon a finding of probable cause (for a temporary SPO) or preponderance of the evidence (for a more permanent SPO), the court may enter an SPO against the defendant and also may award damages to the plaintiff. Further, as with the prevention of commission of a crime, ORS 30.866 as a whole sets out a preventive procedure, that is, the entry of an SPO ostensibly would serve to prevent the defendant from harming the plaintiff in some way. In sum, it is significant to our analysis here that the right to a jury trial did not attach to the procedures in place in 1855 for preventing the commission of a crime.

In light of the foregoing, we conclude that the procedures set out in ORS 30.866 for obtaining an SPO fall within a historical exception to Article I, section 11, and, therefore, cannot be characterized as a "criminal prosecution[ ]" within the meaning of that provision. Accordingly, defendant was not entitled to the constitutional safeguards set out in that provision, such as the right to a jury trial.

█ Defendant also contends that, "as applied" to him, the procedures set out in ORS 30.866 amounted to a criminal

---

[9] A "recognizance" was defined at the time as "[a]n obligation of record, entered into before a court or officer duly authorized for that purpose, with a condition to do some act required by law, which is therein specified." *II Bouvier's Law Dictionary*, 423 (14th ed 1874). A recognizance served to secure the presence of the defendant. *Id.*

prosecution under Article I, section 11. Defendant specifically contends that, on the date that plaintiff filed her complaint, an OSP officer subjected him to a "full custody" arrest, including being frisked and handcuffed. In defendant's view, "[h]e was treated in the same fashion as a person arrested for a crime."

The evidence reflects, as defendant contends, that a police officer frisked and handcuffed him, and transported him by police vehicle, on the date that plaintiff filed her complaint. However, ORS 30.866 does not contemplate such police action. Rather, the statute itself provides for issuance of an arrest warrant only if a defendant fails to appear upon being served with the petition and temporary SPO. ORS 30.866(3)(b). Stated differently, the police actions that defendant cites as demonstrating that ORS 30.866 is "criminal" in nature "as applied" to his case are not part of the statute that he challenges. We therefore reject defendant's "as applied" argument.

## OVERBREADTH

■ Before the trial court and the Court of Appeals, and in his petition for review, defendant contended that ORS 30.866(1) was unconstitutionally overbroad, in violation of Article I, section 8, of the Oregon Constitution, and the First and Fourteenth Amendments to the United States Constitution.[10] At oral argument, however, defendant conceded that this court's decision in *State v. Rangel*, 328 Or 294, 977 P2d 379 (1999), which upheld ORS 163.732, the criminal anti-stalking statute, against a similar challenge, disposed of his overbreadth claim here. We therefore do not address it further.[11]

---

[10] Article I, section 8, of the Oregon Constitution, provides:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

The First Amendment to the United States Constitution provides, in part:

"Congress shall make no law * * * abridging the freedom of speech * * *."

The First Amendment is made applicable to the states through the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 US 254, 264 n 4, 84 S Ct 710, 11 L Ed 2d 686 (1964).

[11] ORS 163.732 provides, in part:

## VAGUENESS

■ Defendant next contends that ORS 30.866(1) is unconstitutionally vague, in violation of Article I, sections 20 and 21, of the Oregon Constitution, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, all set out *post*. Specifically, defendant complains that certain terms in ORS 30.866(1) and, by incorporation, ORS 163.730, fail to provide "fair notice" of the speech and conduct that ORS 30.866(1) prohibits. The state responds that defendant cannot challenge a civil statute such as ORS 30.866(1) upon vagueness grounds under the Oregon Constitution and, alternatively, that the statute is not unconstitutionally vague.

■ We begin with the state's contention that defendant cannot bring a vagueness challenge to a civil statute under

---

"(1) A person commits the crime of stalking if:

"(a) The person knowingly alarms or coerces another person or a member of that person's immediate family or household by engaging in repeated and unwanted contact with the other person;

"(b) It is objectively reasonable for a person in the victim's situation to have been alarmed or coerced by the contact; and

"(c) The repeated and unwanted contact causes the victim reasonable apprehension regarding the personal safety of the victim or a member of the victim's immediate family or household."

As with ORS 30.866, ORS 163.730 sets out a number of definitions for terms used in ORS 163.732.

In *Rangel*, this court construed ORS 163.732(1), together with the definitions of "alarm" and "coerce" set out in ORS 163.730(1) and (2), to require that a contact based upon communication "consist of a threat that convincingly expresses to the addressee the intention that it will be carried out, and that the actor has the ability to do so." *Rangel*, 328 Or at 306 (emphasis omitted). In light of that construction, the court concluded that the statute was not unconstitutionally overbroad under either the state or federal constitutions.

As can be seen, the elements set out in ORS 163.732(1)(a) are different from those set out in ORS 30.866(1)(a) in a number of ways. However, the court's narrowing construction in *Rangel*—which saved the criminal statute from an overbreadth challenge—concerned elements in ORS 163.732(1) (together with ORS 163.730(1) and (2)) that are identical to the elements in ORS 30.866(1) that are at issue here. In light of that conclusion, as well as the lack of any new arguments on defendant's part here, we adopt the reasoning set out in *Rangel* without further elaboration.

We further note that defendant raises a separate challenge to ORS 30.866(1) based upon the free expression and freedom of speech provisions of the state and federal constitutions. However, his argument in that regard incorporates his entire overbreadth argument by reference. Under *Rangel*, we therefore reject it.

the Oregon Constitution. As will be seen, in addressing the state's response to defendant's "fair notice" argument, it is necessary to examine the nature of a vagueness challenge under both Article I, section 20, and Article I, section 21.

We begin with Article I, section 21, which provides, in part:

"No *ex-post facto* law * * * shall ever be passed * * *."

As pertinent to a vagueness challenge, that constitutional provision prevents those charged with enforcing and applying criminal laws "to make the law after the event." *State v. Robertson*, 293 Or 402, 408, 649 P2d 569 (1982); *see also State v. Cornell/Pinnell*, 304 Or 27, 32-33, 741 P2d 501 (1987) (Article I, section 21, prohibits granting "unbridled discretion" to judge and jury in respect of applying criminal statute in question); *Megdal v. Board of Dental Examiners*, 288 Or 293, 298, 303, 605 P2d 273 (1980) (vague criminal laws allow court or jury to define crime after the fact, in violation of Article I, section 21).[12] A "criminal" law, in the *ex post facto* context, is one that carries a sanction that is criminal, as opposed to civil, in nature. *See Davidson v. Oregon Government Ethics Comm.*, 300 Or 415, 425, 712 P2d 87 (1985) (court distinguished civil forfeiture penalty from penal sanctions in criminal cases). Because Article I, section 21, concerns criminal

---

[12] As noted, a vagueness challenge under Article I, section 21, concerns the argument that the particulars of a criminal law are determined after the fact. We note, however, that this court's case law could be read to suggest that a vagueness challenge under Article I, section 21, can encompass a "fair notice" element—that is, that Article I, section 21, prohibits the enactment of a law that fails to inform those who are subject to it, in a sufficiently explicit manner, " 'what conduct on their part will render them liable to its penalties.' " *State v. Plowman*, 314 Or 157, 160, 838 P2d 558 (1992), *cert den* 508 US 974 (1993) (citing *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985)); *see also State v. Chakerian*, 325 Or 370, 382, 938 P2d 756 (1997) (in case involving vagueness challenge under Oregon Constitution, court explained that vagueness doctrine serves functions of providing reasonable notice of prohibited conduct and of preventing judge, jury, and enforcement officials from exercising uncontrolled discretion in punishing defendants).

Upon closer examination of the case law, however, it is apparent that such suggestions concern the nature of the vagueness doctrine generally, rather than articulating any "fair notice" requirement under Article I, section 21. *See Graves*, 299 Or at 195 (in discussing fair notice requirement, court cited *State v. Hodges*, 254 Or 21, 27, 457 P2d 491 (1969), which set out fair notice requirement under Due Process Clause); *see also Chakerian*, 325 Or at 382 (citing *Graves* for "fair notice" proposition); *Plowman*, 314 Or at 160 (same); *Cornell/Pinnell*, 304 Or at 29-30 (same).

laws, this court has stated that it does not apply to a vagueness challenge to a civil law. *See Megdal*, 288 Or at 298, 303 (emphasizing that Article I, section 21, applies to criminal laws; rejecting vagueness challenge to professional licensing statute under Article I, section 21).[13]

Here, defendant challenges the civil anti-stalking statute, ORS 30.866. Particularly, defendant challenges the statutory prerequisites to entry of an SPO, not the procedures and penalties (which, as noted earlier, undoubtedly are criminal in nature) that result if a defendant violates an SPO. The only "penalty," for our purposes here, that results from ORS 30.866 is the entry of an SPO that restricts a defendant from contacting the plaintiff.[14] Such an order, by itself, cannot be considered a punishment that is criminal in nature for purposes of Article I, section 21. Consequently, we conclude that defendant's vagueness challenge under Article I, section 21, is without foundation.

 As noted, defendant also cites Article I, section 20, in his vagueness challenge to ORS 30.866(1). That section provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

Among other things, Article I, section 20, requires that a governmental decision to offer or deny some advantage to a person "be made by permissible criteria and consistently applied." *City of Salem v. Bruner*, 299 Or 262, 268-69, 702

---

[13] We note that, in *Davidson*, 300 Or 415, this court suggested that a civil statute that imposed a forfeiture penalty was more likely to implicate vagueness protections under the state and federal constitutions than a civil statute that governed professional conduct. *See id.* at 425 (so suggesting). However, the court then characterized the vagueness issue as one involving due process under the federal constitution and ultimately concluded that the statute at issue was not vague in any event. *Id.*

Notwithstanding the discussion in *Davidson*, this court's general pronouncements under Article I, section 21, as well as the court's statement in *Megdal*, 288 Or at 298, that Article I, section 21, applies to vagueness challenges to only criminal laws, clarify that a vagueness challenge to a civil law—that is, for *ex post facto* purposes, a law that does not impose a "criminal" penalty—cannot stand under Article I, section 21.

[14] As noted earlier, ORS 30.866(4) also provides for the potential award of damages to the plaintiff, as well as the imposition of reasonable attorney fees and costs.

P2d 70 (1985) (internal quotation marks omitted); *see also State v. Freeland*, 295 Or 367, 374, 667 P2d 509 (1983) (Article I, section 20, prohibits "[h]aphazard" or "standardless" administration of laws) (internal quotation marks omitted). Unlike section 21 of Article I, section 20 applies to both civil and criminal laws. *See, e.g., Libertarian Party of Oregon v. Roberts*, 305 Or 238, 248-51, 750 P2d 1147 (1988) (applying Article I, section 20, to civil law); *State v. Graves*, 299 Or 189, 195-97, 700 P2d 244 (1985) (applying Article I, section 20, to criminal law).

In the context of a vagueness challenge to a criminal law under Article I, section 20, the inquiry is whether the enactment at issue "creat[es] a serious danger of unequal application" of the enactment. *Cornell / Pinnell*, 304 Or at 32; *see also Graves*, 299 Or at 195 (Article I, section 20, is implicated "when vague laws give unbridled discretion to judges and jurors to decide what is prohibited in a given case, for this results in the unequal application of criminal laws"). This court has not articulated the extent—if any—to which the standard for analyzing an arguably vague civil law for haphazard and standardless administration, such as ORS 30.866(1), might be different from the standard applicable to criminal laws.[15]

In this case, however, we need not determine the appropriate standard for reviewing a civil law for vagueness under Article I, section 20. That is so, because defendant has not cast his argument in terms of unequal application of the laws. Rather, defendant argues that ORS 30.866(1) does not provide "fair notice" of the conduct that it prohibits. In short,

---

[15] In *Anderson v. Peden*, 284 Or 313, 326, 587 P2d 59 (1978), this court stated that a vagueness challenge to a civil law under Article I, section 20, "must show that in fact a policy unlawfully discriminating in favor of some persons against others either has been adopted or has been followed in practice." However, that case involved a different type of complaint under Article I, section 20, namely, that discretionary administration of governmental policy resulted in discrimination against a group or class of persons.

We also note that this court has invalidated a civil law upon the ground that a disputed term was "too vague to convey a definite meaning capable of serving as a standard or guide in carrying that portion of the [statute] into effect," resulting in the determination of compliance being left "to the unguided judgment" of those applying the statute. *Vinton v. Hoskins*, 174 Or 106, 116, 147 P2d 892 (1944). In that case, however, the court cited neither Article I, section 20, nor any other state or federal constitutional provision, as a basis for its decision.

although defendant cites Article I, section 20, his vagueness challenge is not grounded in the protection that that constitutional provision affords. *See generally State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000) (to preserve claim of error on appeal, party must provide trial court with explanation sufficient enough to ensure that court can identify alleged error with enough clarity to consider and correct error immediately, if warranted). Accordingly, we agree with the state that defendant's particular vagueness challenge cannot rest upon the Oregon Constitution.

We turn to defendant's challenge to ORS 30.866(1) under the Due Process Clause of the Fourteenth Amendment, which provides:

> "No State shall * * * deprive any person of life, liberty, or property, without due process of law * * *."

In respect of a vagueness challenge under the Due Process Clause, the United States Supreme Court has stated:

> " 'Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory applications[.]' "

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 US 489, 498, 102 S Ct 1186, 71 L Ed 2d 362 (1982) (quoting *Grayned v. City of Rockford*, 408 US 104, 108-09, 92 S Ct 2294, 33 L Ed 2d 22 (1972)). The protection against vague laws that the Due Process Clause affords applies to both criminal and civil laws. *See Chicago v. Morales*, 527 US 41, 119 S Ct 1849, 144 L Ed 2d 67 (1999) (invalidating ordinance that imposed criminal sanctions as unconstitutionally vague); *Rowan v. Post Office Dept.*, 397 US 728, 90 S Ct 1484, 25 L Ed 2d 736 (1970) (upholding civil statute against vagueness challenge).

As noted, defendant's challenge to ORS 30.866(1) focuses upon the "fair notice" component of the federal vagueness doctrine. A threshold inquiry, however, concerns the appropriate standard for evaluating defendant's challenge.

■ ■ According to the Supreme Court, "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement— depends in part on the nature of the enactment." *Hoffman Estates*, 455 US at 498. For example, enactments with civil, rather than criminal, penalties, are subject to greater tolerance, "because the consequences of imprecision are qualitatively less severe." *Id. Compare Morales*, 527 US at 56 (in invalidating ordinance preventing loitering and imposing criminal penalties, question was whether ordinance was "so vague and standardless" that it left public uncertain as to prohibited conduct), *with Roberts v. United States Jaycees*, 468 US 609, 629, 104 S Ct 3244, 82 L Ed 2d 462 (1984) (in upholding anti-discrimination statute, court focused upon whether statutory terms articulated with "reasonable degree of clarity"). Additionally, laws that threaten to inhibit the exercise of constitutionally affected rights, such as the right to free speech, demand a higher level of clarity. *Hoffman Estates*, 455 US at 499; *see also Keyishian v. Board of Regents*, 385 US 589, 603, 87 S Ct 675, 17 L Ed 2d 629 (1967) ("precision of regulation must be the touchstone in an area so closely touching our most precious freedoms," such as freedom of speech (internal quotation marks and brackets omitted)).

■ It arguably might be appropriate in this case to apply a more tolerant vagueness standard under the Due Process Clause to ORS 30.866(1), because that statute, in providing for entry of an SPO, does not impose a penalty that could be considered criminal in nature for purposes of a federal vagueness analysis. However, in *Hoffman Estates*, the Supreme Court applied a "relatively strict test" to an ordinance that imposed civil penalties for selling certain drug paraphernalia without a license, reasoning that the ordinance was "quasi-criminal" in light of its "prohibitory and stigmatizing effect." 455 US at 499. The court ultimately upheld the ordinance, reasoning, among other things, that "[a] business person of ordinary intelligence" would understand its disputed terms.

*Id.* at 489. Because the "prohibitory and stigmatizing effect" of entry of an SPO under ORS 30.866(3)(a) is sufficiently analogous to the ordinance at issue in *Hoffman Estates*, we shall apply a similar standard—whether a person of ordinary intelligence would understand its terms—in our analysis of ORS 30.866(1) for purposes of the Due Process Clause.[16]

We note one additional matter before turning to the specifics of defendant's challenge. Here, defendant challenges the terms "contact," "alarm[ ]," and "personal safety" set out in ORS 30.866(1), and, by incorporation, ORS 163.730(1) and (3).[17] Defendant makes no argument that any aspect of ORS 30.866(1) is vague as applied to his particular case; rather, he contends that "the entire statute leaves a person charged with its violation uncertain as to what is forbidden and what is not." Accordingly, defendant raises only a facial challenge to ORS 30.866(1). *See Hoffman Estates*, 455 US at 494 n 5 (facial vagueness challenge under Due Process Clause "means a claim that the law is invalid *in toto*—and therefore incapable of any valid application" (internal quotation marks omitted)). We therefore must determine whether, in light of his specific contentions, that statute "is impermissibly vague in all of its applications." *Id.* at 495.

As noted, defendant first challenges the term "contact" in ORS 30.866(1). Specifically, defendant complains that the statutory definition for "contact" set out in ORS 163.730(3) is unconstitutionally vague because it states that "contact" "includes[,] *but is not limited to*," certain, delineated forms of conduct. (Emphasis added.) *See* 334 Or at 129-30 (setting out ORS 163.730(3) in its entirety). In defendant's view, in light of that emphasized wording, there effectively is no limitation upon what may be considered a "contact." It follows, defendant argues, that the statute provides no fair warning of the type of "contact" that it prohibits.

---

[16] The fact that certain types of "contact" delineated in ORS 163.730(3) involve communication also weighs in favor of applying a stricter vagueness standard. *See Hoffman Estates*, 455 US at 499 (laws that threaten to inhibit exercise of right to free speech demand higher level of clarity).

[17] Defendant also challenges the terms "coerc[e]" and "following" in ORS 30.866(1) and, by incorporation, ORS 163.730(2) and (3)(b); however, because he makes no particular argument supporting his contention that those terms are unconstitutionally vague, we do not address those challenges.

In the context of a facial vagueness challenge, defendant's argument fails, because he focuses upon only part of the statutory definition. Specifically, defendant does not contend that the specific, identifiable forms of contact delineated in ORS 163.730(3) are unconstitutionally vague; rather, he contends that other undelineated, unknown forms of contact fail to satisfy the fair notice requirement of the Due Process Clause. In short, defendant's complaint that ORS 163.730(3) does not limit the types of contact that ORS 30.866(1) prohibits fails to establish that the use of that term renders ORS 30.866(1) unconstitutionally vague "in *all* of its applications." *Hoffman Estates*, 455 US at 495 (emphasis added). We therefore reject his challenge to the term "contact."

■ Defendant next challenges the term "alarm," which ORS 163.730(1) defines as "to cause apprehension or fear resulting from the perception of *danger*." (Emphasis added.) In defendant's view, if the term "danger," which is not statutorily defined, is not limited to physical danger, "then there are no confines to the term."

We first note that, in *Rangel*, this court interpreted the term "alarm" in ORS 163.730(1), in the context of a contact involving communication in the form of speech or writing, to require a fear of "imminent and serious personal violence." *Rangel*, 328 Or at 303 (citing *State v. Moyle*, 299 Or 691, 703-05, 705 P2d 740 (1985)).[18] Thus, in the context of communicative contacts,[19] the term "alarm" in ORS 30.866(1) and ORS 163.730(1) refers to causing apprehension or fear of personal violence.

That case law disposes, in part, of defendant's complaint about the term "danger" in ORS 163.730(1), because,

---

[18] The state relies, in part, upon the interpretation in *Moyle*, 299 Or at 706, of the term "alarm" in a different statute—ORS 166.065(1)(d) (1995) (prohibiting telephonic harassment)—that is, "fear *or terror* resulting from a *sudden* sense of danger." (Emphasis added.) We do not apply that definition broadly to the term "alarm" as set out in ORS 30.866(1) in all respects, however, because ORS 163.730(1) sets out a different definition applicable to that statute, namely, "to cause *apprehension* or fear resulting from the *perception* of danger." (Emphasis added.)

[19] Because *Rangel* involved an overbreadth challenge under Article I, section 8, it concerned only contacts that, like those at issue in *Moyle*, implicated speech or expression.

in cases involving communicative contacts, that term speaks to an identifiable effect, that is, fear of personal violence or physical harm. As to noncommunicative contacts, we note that the dictionary defines "danger," in part, as "HARM, INJURY, DAMAGE * * * the state of being exposed to harm : liability to injury, pain, or loss * * *." *Webster's Third New Int'l Dictionary*, 573 (unabridged ed 1993). Even if the foregoing definition applies beyond the concept of "physical" danger in some way (as defendant contends), its application to physical danger is obvious. Stated differently, defendant's argument fails for the same reason as his "contact" argument, because it fails to demonstrate that the term "alarm" is vague in all its applications.

■ Defendant also challenges the term "personal safety" in ORS 30.866(1)(c), arguing that, because that term is not defined by statute, "it is * * * not clear what the legislature meant." Defendant's premise that the lack of a statutory definition for a particular term, in itself, renders the term unconstitutionally vague is incorrect. Rather, the inquiry here is whether the term at issue identifies the prohibited conduct for a person of ordinary intelligence. *See State v. Farrar*, 309 Or 132, 183, 786 P2d 161 (1990), *cert den* 498 US 879 (1990) (no separate statutory definition required when statutory phrase at issue identifies prohibited conduct); *see also Hoffman Estates*, 455 US at 498 (setting out "person of ordinary intelligence" standard).

Here, the term "personal safety" has an identifiable meaning. The word "personal," among other things, means:

"**1** : of or relating to a particular person * * * **3** : relating to the person or body : BODILY ‹~ appearance› ‹~ liberty› * * *."

*Webster's Third New Int'l Dictionary* at 1686. The word "safety," among other things, means:

"**1** : the condition of being safe : freedom of exposure to danger : exemption from hurt, injury, or loss * * * ‹ferried in ~ across the river› * * *."

*Id.* at 1998. Thus, the term "personal safety" refers to the state of a particular individual being free from danger or harm, *see id.* at 573 (defining "danger," in part, as "HARM, INJURY, DAMAGE" and "the state of being exposed to

harm"), or from other hurt or loss. In short, despite its lack of a statutory definition, the term "personal safety" in this context carries an identifiable meaning that is understandable to a person of ordinary intelligence and, therefore, is not unconstitutionally vague.

Finally, defendant contends that,

> "[i]n analyzing the stalking statute, all of the terms which are vague must be considered together. When the statute is read as a whole, the vagueness of each term compounds the vagueness of the others. Because so many of the terms used in the statute are vague, the citizens of Oregon cannot be sure if their conduct is prohibited under the statute, and consequently, the statute is unconstitutional."

As can be seen from the foregoing, we disagree with defendant's premise. The terms that he challenges are not vague by failing to identify the prohibited conduct for a person of ordinary intelligence; consequently, his argument that the statute itself is vague as a whole is without foundation. We reject defendant's argument that ORS 30.866(1) fails to provide fair notice under the Due Process Clause.

## RIGHT TO TRAVEL

Defendant finally contends that, by allowing entry of an SPO, ORS 30.866(3)(a) violates his constitutional right to travel freely from place to place. As support, defendant generally cites Article I, sections 8 and 33, of the Oregon Constitution,[20] and the First and Fourteenth Amendments to the United States Constitution, contending that he has a "penumbral constitutional right to walk freely about public sidewalks and walkways."

As to the Oregon Constitution and the First Amendment, defendant cites cases that involved the right to use public areas for free expression, free association, and petitioning purposes. Defendant otherwise does not articulate with any clarity his rationale that ORS 30.866(3)(a) violates the constitutional provisions that he cites, respecting violation of a constitutional right to travel; we also have found no

---

[20] Article I, section 33, provides: "This enumeration of rights, and privileges shall not be construed to impair or deny others retained by the people."

case law supporting that proposition. Further, defendant made no "penumbral" argument under Article I, section 33, to the trial court or to the Court of Appeals. Consequently, we reject defendant's arguments under the state constitution and the First Amendment without further discussion.

As to the Fourteenth Amendment, defendant primarily relies upon *Morales*, 527 US 41, which the United States Supreme Court decided after the Court of Appeals issued its decision in this case. In *Morales*, the Supreme Court invalidated a city "gang-congregation" ordinance upon vagueness grounds, holding that the prohibition in the ordinance against "loitering" by certain persons, defined as "remain[ing] in any one place with no apparent purpose," *id.* at 47, specified no standard of conduct and, therefore, violated the Due Process Clause. *Id.* at 60. Before engaging in its vagueness analysis, the Court stated:

> "* * * [T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. We have expressly identified this right to move from one place to another according to inclination as an attribute of personal liberty protected by the Constitution. * * * Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is a part of our heritage * * * or the right to move to whatsoever place one's own inclination may direct * * *."

*Id.* at 53-54 (internal quotation marks, citations, and footnotes omitted). *See also Kent v. Dulles*, 357 US 116, 126, 78 S Ct 1113, 2 L Ed 2d 1204 (1958) ("Freedom of movement is basic in our scheme of values."). Thus, the Court in *Morales* declared that the right to move about freely in a public place indeed is protected by the Due Process Clause; however, it did not have occasion to analyze the limitations of the ordinance at issue upon that right.

The Supreme Court, however, has explored the constitutionality of limitations upon the right to travel in other contexts. In *Aptheker v. Secretary of State*, 378 US 500, 84 S Ct 1659, 12 L Ed 2d 992 (1964), in analyzing the constitutionality of certain restrictions upon the ability of United States

citizens to travel abroad, the Court applied the following "well-established principle[ ]" for testing "whether the restrictions * * * imposed are consistent with the liberty guaranteed" by constitutional due process protections:

> "It is a familiar and basic principle, recently reaffirmed in *NAACP v. Alabama*, 377 US 288, 307[, 84 S Ct 1302, 12 L Ed 2d 325 (1964)], that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.' * * * In applying this principle the Court in *NAACP v. Alabama, supra*, referred to the criteria enunciated in *Shelton v. Tucker*, [364 US 479,] 488[, 81 S Ct 247, 5 L Ed 2d 231 (1960)]:
>
> > " '[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose.' "

*Id.* at 508 (final brackets in original; citations omitted). The Court then examined the congressional purpose supporting the statute at issue, *id.* at 509, and concluded that the statute swept too broadly and, therefore, was unconstitutional on its face, *id.* at 514. *See also Zemel v. Rusk*, 381 US 1, 85 S Ct 1271, 14 L Ed 179 (1965) (affirming restrictions upon travel to Cuba, in light of national security justifications).

Here, the legislative purpose behind ORS 30.866 is apparent from the text of that statute: The legislature was concerned with preventing the commission of certain crimes against particular persons and their immediate families or household members. To prevent the commission of such crimes, which is a legitimate legislative purpose, the legislature created a mechanism in ORS 30.866 whereby a potential criminal defendant could be prevented from "contact[ing]" a potential crime victim:

> "(2) At the time the petition [for a civil SPO] is filed, the court, upon a finding of probable cause based on the allegations in the petition, shall enter a temporary court's stalking protective order that may include, but is not limited to, all contact listed in ORS 163.730. The petition and

the temporary order shall be served upon the respondent with an order requiring the respondent to personally appear before the court to show cause why the temporary order should not be continued for an indefinite period.

"(3)(a) At the [subsequent] hearing, * * * the court * * * may proceed to enter a court's stalking protective order * * *."

*See also* ORS 163.730(3) (delineating 11 forms of prohibited contact). The types of contact specified in ORS 163.730(3) are limited to particular interactions or communications between the defendant and the plaintiff, a member of the plaintiff's immediate family or household, or some other third party connected to the plaintiff. Further, although a temporary SPO entered under ORS 30.866(2) (and, ultimately, a more permanent SPO entered under ORS 30.866(3)(a)) may prohibit contact that is not delineated under ORS 163.730(3), the context of the statutes as a whole demonstrates that such a prohibition must relate to the type of contact that gave rise to the entry of an SPO in the first instance. *See* ORS 30.866(1) (setting out conduct providing basis for filing petition); ORS 30.866(2) (court may enter temporary SPO upon finding of probable cause based upon allegations in petition). We conclude that the means of achieving the legislative purpose of preventing the commission of certain crimes set out in ORS 30.866(2) and (3)(a) and ORS 163.730(3)(a) are sufficiently narrowly drawn, so as to satisfy the Due Process Clause. *See generally Zemel,* 381 US at 14 ("the fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited").

Defendant also cites as problematic the "unlimited duration" of an SPO entered under ORS 30.866(2) and (3)(a). Although it is true that ORS 30.866(2) contemplates the future entry of an SPO for an "indefinite period," even assuming that such a provision implicates any constitutional right to travel, we think it significant that nothing in ORS 30.866 prevents a defendant from seeking a modification, including a change in duration.[21] Defendant does not otherwise articulate how the lack of a provision for termination or any time

---

[21] Indeed, in this case, the trial court's order required plaintiff to notify the court if she moved more than 50 miles from Corvallis and, if so, that defendant may request dismissal; the order otherwise provided that defendant may request dismissal two years after the date of the order.

limitation in ORS 30.866 gives rise to a constitutional violation of his right to travel under the Due Process Clause. Without further elaboration from defendant, we decline to address that aspect of his argument further.[22]

## CONCLUSION

In sum, we conclude that: (1) the trial court did not err in denying defendant's motion to dismiss, based upon insufficient evidence; (2) ORS 30.866 falls within a historical exception to Article I, section 11, of the Oregon Constitution, and, therefore, does not require the protections for "criminal prosecutions" set out in that provision; (3) ORS 30.866(1) is not unconstitutionally overbroad, as contended by defendant, in violation of Article I, section 8, of the Oregon Constitution; (4) defendant cannot bring a vagueness challenge to ORS 30.866(1) under Article I, section 21, of the Oregon Constitution; (5) defendant's "fair notice" vagueness challenge to ORS 30.866(1) is not grounded in Article I, section 20, of the Oregon Constitution; (6) ORS 30.866(1) and, by incorporation, ORS 163.730(1) and (3), are not unconstitutionally vague, in the respects asserted by defendant, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and (7) ORS 30.866 does not violate the Due Process Clause of the Fourteenth Amendment respecting any right of defendant to travel freely from place to place.

The decision of the Court of Appeals and the order of the circuit court are affirmed.

---

[22] Defendant also contends in his petition for review that ORS 30.866, "*as applied here*, purports to forbid an Oregon citizen from walking on public sidewalks to conduct his or her business in a peaceable manner," (emphasis added) and, therefore, "is an illegal restraint on constitutionally protected activity." However, before the trial court and the Court of Appeals, defendant challenged only the facial validity of ORS 30.866 in respect of his constitutional right to travel. We therefore do not address his "as-applied" argument.