TOOKEY, J.
*830 The subject of this case is a vintage 1985 Suzuki moped. Defendant appeals a conviction for the unauthorized use of that vehicle (UUV). ORS 164.135.[1] On appeal, defendant assigns error to the trial court's denial of his motion for judgment of acquittal on that charge, arguing that "[t]he evidence is insufficient to show that defendant knew that the moped was stolen."[2] We conclude that a rational factfinder could have found that the state proved beyond a reasonable doubt that defendant knew this moped was stolen, and, therefore, the trial court did not err when it denied defendant's motion for judgment of acquittal. Accordingly, we affirm.
When reviewing the denial of a motion for judgment of acquittal, we review the facts in the light most favorable to the state and draw all reasonable inferences in the state's favor to determine "whether any rational trier of fact, accepting reasonable inferences and credibility choices, could have found the essential elements of the crime beyond a reasonable doubt."
*100 State v. Lupoli , 348 Or. 346, 366, 234 P.3d 117 (2010). Additionally, "when, as here, a defendant makes the [motion for judgment of acquittal] at the close of the state's case, 'the appellate court must consider all the evidence and if it is sufficient to sustain the conviction.' "
*831 State v. Bilsborrow , 230 Or. App. 413, 418-19, 215 P.3d 914 (2009) (quoting State v. Gardner , 231 Or. 193, 195, 372 P.2d 783 (1962) ). We present the facts consistently with that standard.
As relevant to this appeal, defendant was charged with UUV. The state alleged that defendant "unlawfully and knowingly took, operated, rode in, exercised control over, or otherwise used a motor vehicle, without the permission of the owner."
At trial, the state called the victim and Deputy Mintier as witnesses on behalf of the state. The victim was the owner of a "vintage" 1985 Suzuki moped that ran "perfectly." When the victim purchased the moped, the victim received service records and multiple bills of sale that documented the previous owners of the moped. In that condition, the moped was worth approximately $ 950 because the moped was titled and street legal. On May 28, 2015, the victim left the state to attend his grandmother's funeral in California. When the victim returned home on June 2, the victim discovered that his moped was missing from his parking spot. The victim immediately reported the moped as stolen because the victim had not given anyone permission to use his moped.
On June 7, Mintier stopped defendant for speeding on a moped. As part of the routine procedure for conducting a traffic stop, Mintier ran the license plate and learned that the license plate came back to the victim's stolen moped. Eventually, Mintier was able to determine that the moped that defendant was riding did not match the make and model of the moped registered to the license plate and that the moped that defendant was riding had not been reported as stolen. Although the moped that defendant was riding had not been reported as stolen, defendant admitted to Mintier that he had switched the license plate that was on the moped that he was riding with the license plate from a moped that was at defendant's home.
When defendant and Mintier arrived at defendant's home, Mintier found the victim's moped with the license plate removed. Defendant told Mintier that he bought the victim's moped off of Craigslist "about a week prior and had no way of contacting the seller." Defendant also stated that *832 he did not have any emails, text messages, or phone call records that would help identify the seller, and that he could not provide the full name of the seller. Defendant produced a "highly suspicious" bill of sale that Mintier said would "set off some alarm bells" if he were purchasing a vehicle. A bill of sale generally has "[t]he full name of the seller, the date of the sale, the agreed price, * * * a statement releasing ownership of the vehicle to the new owner," a "full description of the vehicle, including the VIN number, any license plate information or title information, and contact information * * * for the previous owner and the new owner." Defendant's bill of sale was handwritten on the back of a used 3" x 5" index card, identified the seller only as "Jerry W.," listed an address that did not belong to any structure, did not identify the model of the moped, did not identify the moped's VIN or license plate number, and did not identify the buyer or contain defendant's name or his signature.[3] Additionally, the bill of sale listed the sale price as $ 100, but defendant told Mintier that he purchased the moped for $ 50. Defendant acknowledged to Mintier that $ 50 for this type of moped "seemed very cheap" and that the "bill of sale also looked suspicious." Defendant was arrested for the unlawful use of the victim's moped.
When the moped was returned to the victim, "[t]he ignition had been brute forced * * * so you could start it with any key or anything that was like the shape of a key, a screwdriver, whatever." Additionally, "[t]he kick start magneto was broken and being held up with a bungee cord," the mirrors were missing, the milk crate attached to the back was missing, and the engine had been tampered with so the moped was "going faster than it's supposed [to] legally be allowed *101 to go, and it wasn't getting nearly as good as gas mileage."
At the close of the state's case, defendant moved for a judgment of acquittal, arguing that the state failed to prove that "defendant had actual, real knowledge that he lacked permission of the owner to use or possess" the moped. The trial court denied defendant's motion for judgment of acquittal.
*833 Defendant then called his friend, Reidy, as a witness on his behalf. Reidy and defendant had known each other for 13 years, and they were both "mechanically inclined" and had knowledge about mopeds. During the time that Reidy had known defendant, Reidy had been convicted of unauthorized use of a vehicle, possession of a stolen vehicle, felon in possession of a firearm, second-degree forgery, and possession of a controlled substance. Reidy testified that he came into possession of the victim's moped when Reidy was "hanging out" with a woman that Reidy "was kind of * * * friends with at the time," and they "went over [to] a guy's house [that] she knew," Robert. Reidy testified that he purchased the moped from Robert for $ 100, called defendant on defendant's cell phone, and sold the moped to defendant "a couple of hours" later for "a couple hundred dollars." Additionally, Reidy testified that he received the same suspicious bill of sale from Robert and that he gave the bill of sale to defendant. As noted, the bill of sale listed "Jerry W." as the seller, not Robert, and Reidy's name is not on the bill of sale. Shortly after defendant was arrested for using the victim's moped, Reidy found out, but Reidy did not contact the police or the district attorney's office to "say there's been a misunderstanding" because the moped "was bought fair and square."
During his closing argument, defendant reiterated his contention that the state had failed to prove that defendant "had actual knowledge that this moped was stolen." The jury found defendant guilty of one count of UUV.
On appeal, defendant assigns error to the trial court's denial of his motion for judgment of acquittal, reprising his argument that the state failed to prove that defendant actually knew that the moped was stolen. See State v. Bell , 220 Or. App. 266, 269, 185 P.3d 541 (2008) (because the indictment for UUV alleged that the defendant acted knowingly, "the state was required to prove that [the] defendant actually knew that the car was stolen" (emphasis in original)). Defendant compares the circumstances of this case to Bell , 220 Or. App. 266, 185 P.3d 541 ; State v. Shipe , 264 Or. App. 391, 332 P.3d 334 (2014) ; and State v. Korth , 269 Or. App. 238, 344 P.3d 491 (2015), cases in which we concluded that the evidence was insufficient to support an inference that the *834 defendants knew that the vehicles they were using were stolen. In response, the state contends that those cases are distinguishable "because this case involves more and different circumstantial evidence that, when viewed together, would allow a factfinder to conclude beyond a reasonable doubt that defendant knew the vehicle was stolen."
"Thus, we must determine whether, viewing the evidence in the light most favorable to the state, a rational factfinder could have found that the state proved beyond a reasonable doubt that defendant knew the [moped] was stolen." Korth , 269 Or. App. at 243, 344 P.3d 491. "The state may prove a defendant's knowledge with circumstantial evidence and reasonable inferences flowing from that evidence." Id ."However, an inferred fact 'must be one that a rational factfinder can be convinced follows beyond a reasonable doubt from the underlying facts.' " Id . (quoting Bell , 220 Or. App. at 270, 185 P.3d 541 ). "Evidence is 'insufficient to support an inference when the conclusion to be drawn from it requires too great an inferential leap-that is, when the logic is too strained,' or when it 'requires the stacking of inferences to the point of speculation.' " Id . (quoting State v. Bivins , 191 Or. App. 460, 466-68, 83 P.3d 379 (2004) ). "Whether the evidence supports a particular inference is a question of law." Id .
Our opinions in other UUV and possession of a stolen vehicle (PSV) cases are instructive and, in light of the parties' arguments, we begin our discussion with an overview of our opinions in Bell , Shipe , and Korth .
*102 In Bell , the defendant was convicted of UUV and PSV after he was stopped while driving a car that had been reported stolen. 220 Or. App. at 268, 185 P.3d 541. During a bench trial, the officer testified that the defendant had told him that he had rented the car from a stranger for $ 50, but the "defendant did not explain how or when the vehicle was to be returned to its owner," and the officer "had not asked [the] defendant about those matters." Id . Additionally, the defendant had the proper car keys, and the car itself had not been "hot-wired," showed no signs of vandalism, and had Oregon license plates. Id .
On appeal, the state argued that, although there was "no evidence of tampering or foul play," the evidence *835 that the defendant had rented the car from a stranger for $ 50, had no way to re-contact the stranger, no deadline to return the vehicle, and no location to deposit the vehicle, led "to reasonable inferences that [the] defendant both knew the car was stolen and knew that he did not have permission from the owner to operate the car." Id . at 271, 185 P.3d 541. We noted that, even "[a]ssuming for the sake of argument that such evidence would permit the inference that the state suggest[ed]," the state had failed to elicit any evidence "one way or the other" about whether the defendant had a way to recontact the person who rented the car to him, whether the defendant had a deadline to return the car, or whether the defendant was told to return the car because the officer did not ask the defendant about those matters. Id . at 271-72, 185 P.3d 541. We explained that "[t]he state cannot prove its case by relying on inferences to be drawn from an absence of evidence that it failed to establish at trial." Id . at 272, 185 P.3d 541. We reasoned that the remaining evidence that the defendant had pulled over when he was followed by an officer, that he was driving a car that had been reported stolen, and that he told the arresting officer that he had rented the car for $ 50 was "insufficient to permit a finding beyond a reasonable doubt that [the] defendant actually knew that the car was stolen and that he did not have the consent of the owner to drive it." Id . (emphasis in original). Accordingly, we concluded that the trial court erred when it denied the defendant's motion for judgment of acquittal. Id .
Similarly, in Shipe , the defendant was convicted of UUV after he was found sitting in the driver's seat of a stolen pickup truck in the parking lot of an apartment complex. 264 Or. App. at 392-94, 332 P.3d 334. In that case, the evidence, viewed in the light most favorable to the state, was that the defendant drove a stolen truck containing stolen property, bolt cutters, a locked case labeled "crime committing kit," and baggies of methamphetamine matching those found on the defendant. Id . at 397, 332 P.3d 334. Additionally, the truck owner's registration and insurance card were missing, the interior and exterior of the truck had "considerable" damage, and the ignition was in working order, but the key that the defendant used to operate the truck did not belong to the owner. Id . at 393, 397, 332 P.3d 334. Finally, the defendant told the arresting officer that he had gotten the truck from someone named "Richey," but he had actually *836 gotten the truck from someone named "Smith," who had stolen at least one vehicle before. Id . at 397, 332 P.3d 334.
On appeal, the state argued that that evidence was sufficient to support a determination that the defendant actually knew the truck was stolen. We noted that, although the key did not belong to the truck's owner, there was no evidence that the key looked "suspicious" or that the defendant knew that the key did not belong to "anybody who was authorized to use the truck." Id . at 397, 332 P.3d 334. Additionally, there was no evidence regarding the extent of the damage to the truck, or whether that damage "would have suggested that the truck had been stolen" (for example, damage to the windows, locks, ignition, or wiring). Id . at 397-98, 332 P.3d 334. We also observed that the absence of the owner's registration and insurance card did not support a determination that the defendant knew the truck was stolen because there was no evidence that the defendant was aware of the missing registration and insurance. Id . at 398, 332 P.3d 334. With respect to the stolen property, we observed that, although those items in the truck may have supported an inference that the defendant *103 knew that that property was stolen, particularly given the presence of the bolt cutters and the "crime committing kit," the state failed to explain how "the presence of stolen property within the truck would have indicated to [the] defendant that the truck itself was stolen." Id . (emphasis in original). Finally, regarding the defendant's lie to the officer about who had given him the truck, we stated that, "[a]lthough it may be reasonable to infer that [the] defendant lied to protect Smith in relation to some wrongdoing"-"particularily given the presence of apparently stolen documents, drug residue, and a 'crime committing kit' inside the truck"-"it does not follow, as a matter of logical probability, that [the] defendant lied because he knew that Smith had stolen the truck ." Id . at 398-99, 332 P.3d 334 (emphasis in original). Accordingly, we concluded that the trial court erred when it denied the defendant's motion for judgment of acquittal. Id .
Likewise, in Korth , the defendant was convicted of UUV after he was pulled over driving a stolen pickup truck. 269 Or. App. at 239, 344 P.3d 491. In that case, the evidence, viewed in the light most favorable to the state, was that the defendant *837 was stopped while driving a stolen truck and "told officers a detailed, 'implausible' story about borrowing the truck from 'Dave,' a 'pretty transient' 'friend of a friend' in Salem whom the defendant had met only 'about a week and a half to two weeks' prior to his arrest." Id . at 245-46, 344 P.3d 491. Additionally, the defendant told the officers that "he planned to return the truck later that day, but he did not know 'Dave's' last name, address, or telephone number." Id . at 246, 344 P.3d 491. The defendant had also lied to the officers about being in the back of the truck where "jiggle keys" were found, in plain sight, next to the defendant's belongings. Id .[4] Despite the presence of "jiggle keys," the defendant used a valid key to operate the truck and, when the truck was returned to the owner, the only damage that the owner reported was a dent in the truck's hood. Id .
On appeal, we began by noting that, neither the "defendant's 'implausible' story about borrowing the truck from 'Dave,' " nor the "evidence that [the] defendant lied to cover up 'some wrongdoing,' " were, standing alone, "sufficient to support a reasonable inference that [the] defendant actually knew that the truck was stolen." Id . (quoting Shipe , 264 Or. App. at 398-99, 332 P.3d 334 (emphasis in Shipe )). Therefore, we stated that the question reduced to whether a factfinder could reasonably infer from the proximity of the "jiggle keys" to the defendant's belongings in the back of the truck-"in addition to [the] defendant's implausible story about borrowing the truck from 'Dave' and his lies about being in the back of the truck and owning any of the property in the back of the truck"-that the "defendant knew that the truck was stolen." Id . (emphasis in original).
We explained that, although a factfinder could reasonably infer that the "defendant had knowledge of 'some wrongdoing, it d[id] not follow, as a matter of logical probability,' that [the] defendant knew that the truck was stolen." Id. (quoting Shipe , 264 Or. App. at 398, 332 P.3d 334 (emphasis in Shipe )). We reasoned that, although it might be logical to infer from that evidence that the defendant was trying *838 to hide his knowledge of the "jiggle keys" from the officers because the defendant knew that the person he had gotten the vehicle from was involved in the theft of vehicles, that evidence did not indicate that the defendant knew "that this truck was stolen" because the defendant operated the truck with a valid key, and not the "jiggle keys" in the back of the truck, "and there was no other evidence that the appearance of the truck * * * would have indicated that the truck had been stolen (such as evidence of damage to the truck's locks, windows, or ignition)." Id . at 247, 344 P.3d 491 (emphasis in original). Based on the evidence presented at trial, we concluded that the inference that the defendant actually knew that the truck was stolen " 'requires the stacking of inferences to the point of speculation.' " Id . (quoting *104 Bivins , 191 Or. App. at 468, 83 P.3d 379 ). Accordingly, we concluded that the trial court erred when it denied the defendant's motion for judgment of acquittal. Id .
In this case, the evidence is qualitatively different than the evidence in Bell , Shipe , and Korth . Here, there is evidence of "tampering" and "foul play" that is "relevant to defendant's knowledge" that this moped was stolen. Bell , 220 Or. App. at 271-72, 185 P.3d 541.
First and foremost, in this case, there is the type of evidence that we have consistently found was lacking in our other UUV and PSV cases-something about the physical appearance of the vehicle that would have indicated to the defendant that the vehicle had been stolen. See Korth , 269 Or. App. at 247, 344 P.3d 491 (the defendant operated the truck with a valid key and there was nothing about the appearance of the truck that would have indicated to the defendant that it had been stolen, "such as evidence of damage to the truck's locks, windows, or ignition"); Shipe , 264 Or. App. at 393, 397, 332 P.3d 334 (noting that the truck's "ignition was in working order" and the defendant did not operate the truck with a key that appeared "suspicious," and that the record did not include any "evidence about whether the widows, locks, ignition, or wiring had been damaged or tampered with at all, much less in a way that would have been noticed by anybody using the truck"); Bell , 220 Or. App. at 271, 185 P.3d 541 (noting the absence of evidence of "tampering or foul play" with the vehicle);
*839 State v. Shuneson , 132 Or. App. 283, 286, 888 P.2d 90 (1995) (observing that there "was nothing unusual about the appearance of the vehicle, such as hot wires, that would have indicated to defendant that it was stolen").
Here, as noted above, defendant was mechanically inclined and, when the victim's moped was returned by the police, "[t]he ignition had been brute forced * * * so you could start it with any key or anything that was like the shape of a key, a screwdriver, whatever." It is logical to infer from that evidence that defendant either bought the moped with a tampered ignition, or that defendant "brute forced" the ignition because he did not have a valid key. The "brute forced" ignition on the moped is the type of obvious damage that would indicate to defendant that this moped was stolen. See Korth , 269 Or. App. at 247, 344 P.3d 491 (noting that evidence of obvious damage to the ignition would indicate to a user of the vehicle that the vehicle is stolen).
Moreover, the removal of the license plate from the victim's moped, along with other accessories (the mirrors and milk crate), indicates that defendant altered the moped's appearance because he knew that the moped was stolen. Although defendant's choice to ride another moped with that stolen license plate could suggest that defendant did not know that the moped was stolen, the fact that that decision ultimately proved to be unwise does not mean that that is the only logical inference that could be drawn. It is also reasonable to infer from that evidence that defendant unlawfully switched the license plate and altered the appearance of the victim's moped in an effort to conceal the true identity of the victim's moped. See State v. Smith , 261 Or. App. 665, 674, 322 P.3d 1129, rev. den. , 355 Or. 880, 333 P.3d 334 (2014) (in "the event that historical facts give rise to more than one reasonable inference, the jury must decide which of the permissible inferences to draw" (internal quotation marks omitted)); State ex rel. Juv. Dept. v. Hal , 168 Or. App. 76, 78-79, 7 P.3d 535 (2000) (driver of a stolen vehicle "at least had reason to believe" that the vehicle was stolen, in part, because the interior had been stripped and the vehicle had out-of-state license plates); ORS 803.550(3)(a) (a "registration plate is illegally displayed" if the plate "[i]s displayed on a vehicle other than the vehicle for which the plate was issued").
*840 Second, in this case there is evidence of "foul play" surrounding defendant's purported purchase of the victim's moped that is relevant to determining whether defendant knew that the moped was being used without the victim's consent. Bell , 220 Or. App. at 271, 185 P.3d 541. Here, the "highly suspicious" bill of sale is also evidence that would have indicated to defendant that he was using the moped without the owner's consent. As described in greater detail above, despite *105 defendant's knowledge about mopeds, the bill of sale lacked any of the information that is generally in a bill of sale, including any way to identify this moped, valid contact information for the seller, "Jerry W," or any information about the buyer. Furthermore, defendant acknowledged that the bill of sale "looked suspicious" and that $ 50 "seemed very cheap" for a moped that was actually worth approximately $ 950. Defendant's acknowledgement that $ 50 was a "very cheap" price for the victim's moped and that the bill of sale was "suspicious," supports a logical inference that defendant knew that this moped was stolen. See Shipe , 264 Or. App. at 397-98, 332 P.3d 334 (noting that there was no evidence that the key that the defendant used to operate the vehicle looked "suspicious," and that the absence of the owner's vehicle registration or insurance could indicate that the defendant knew that the vehicle was stolen if the defendant was aware of the missing registration and insurance card).
Unlike in Korth and Shipe , where there was evidence of drugs, stolen property, "jiggle keys," and a "crime committing kit"-evidence that was unrelated to any wrongdoing with the stolen vehicles in those cases-here, the "brute forced" ignition, the removal of the license plate, the "highly suspicious" bill of sale, and the "very cheap" sale price relate to wrongdoing with this moped. See Korth , 269 Or. App. at 246-47, 344 P.3d 491 ("jiggle keys" in the back of a truck supported an inference of "some wrongdoing," but the presence of "jiggle keys" would not have indicated to the defendant that the truck was stolen because the defendant operated the truck with a valid key, and not the "jiggle keys" found in the back of the truck); Shipe , 264 Or. App. at 397-99, 332 P.3d 334 (concluding that it would be illogical to infer that the presence of methamphetamines, stolen property, bolt cutters, and a "crime committing kit" indicated that the defendant knew that the truck *841 itself was stolen). Taken together, the "brute forced" ignition, the removal of the license plate, the alterations to the moped's appearance, the "highly suspicious" bill of sale, and the "very cheap" price would permit a factfinder to logically infer that defendant actually knew that this moped was stolen because that evidence indicates that the moped itself was stolen. See Smith , 261 Or. App. at 674, 322 P.3d 1129 ("A reasonable inference from the historical facts in evidence may permissibly be drawn if there is an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact." (Brackets and internal quotation marks omitted.)).
Finally, although we have concluded that an implausible story alone is insufficient to prove that a defendant knew that a vehicle was stolen, in this case, we must consider whether a factfinder could reasonably infer from the evidence discussed above-"in addition " to defendant's and Reidy's inconsistent and implausible stories about defendant's purchase of the victim's moped-that defendant knew that the moped was stolen. Korth , 269 Or. App. at 246, 344 P.3d 491 (emphasis in original).
As discussed above, Mintier testified that defendant told him that defendant purchased the victim's moped on Craigslist for $ 50 and did not have any way to contact the seller listed on the "highly suspicious" bill of sale, "Jerry W." However, defendant's friend Reidy, who had multiple convictions for UUV, PSV, and forgery, told a different story when he testified on defendant's behalf. Reidy testified that he had purchased the Moped from Robert for $ 100, not "Jerry W.," called defendant on defendant's cell phone, and then sold the moped to defendant for a couple hundred dollars and gave defendant the "highly suspicious" bill of sale.
In particular, we note that the "highly suspicious" bill of sale from "Jerry W." does not corroborate defendant's or Reidy's account about the sale of the moped. Additionally, Reidy's testimony presented an account about the sale of the moped that was both extrinsically and intrinsically implausible in relationship to defendant's account: extrinsically, because it conflicted with the account that defendant gave to Mintier (with respect to whether defendant purchased the moped on Craigslist and whether defendant knew the seller *842 or how to contact the seller); and intrinsically, because it is reasonable to infer that a person who believed that he or she lawfully purchased the moped would provide the seller's contact information to the *106 police. In other words, Reidy's testimony tilted the balance further in favor of the state because, to believe either defendant's or Reidy's inconsistent accounts, the jury would need to conclude that either defendant or his witness, Reidy, had lied about purchasing the moped. Furthermore, in this case, those lies were not directed at covering up "some [other] wrongdoing" unrelated to defendant's authority to use this moped. Shipe , 264 Or. App. at 398-99, 332 P.3d 334 (emphasis in original). Thus, given Reidy's criminal history of forgery and using and possessing stolen vehicles, along with the "brute forced" ignition, the removal of the license plate, the alterations to the moped's appearance, the "highly suspicious" bill of sale, and the "very cheap" price, it follows, as a matter of logical probability, that either defendant or Reidy, or both, had lied about the sale of the moped because defendant knew that the moped was stolen. The jury, having considered the evidence discussed above, in addition to the implausible and inconsistent accounts about the sale of the moped, could permissibly have found beyond a reasonable doubt that defendant knew that this moped was stolen.
In sum, viewing the evidence as a whole and in the light most favorable to the state, a rational factfinder could have found that the state proved beyond a reasonable doubt that defendant knew the moped was stolen. Accordingly, the trial court did not err in denying defendant's motion for judgment of acquittal for UUV.
Affirmed.

ORS 164.135(1)(a) provides that "[a] person commits the crime of unauthorized use of a vehicle when" the "person takes, operates, exercises control over, rides in or otherwise uses another's vehicle * * * without the consent of the owner." In cases such as this one, where the state alleges that the defendant acted knowingly, "[t]hat person must know that he or she does not have the owner's consent." State v. Gibson , 268 Or. App. 428, 430, 342 P.3d 168 (2015). In other words, that person must "actually" know that the vehicle is stolen. State v. Korth , 269 Or. App. 238, 242, 344 P.3d 491 (2015).

In a second assignment of error, defendant argues that the "trial court [plainly] erred when it imposed $ 819 in restitution" for the damage that was caused to the victim's moped while it was stolen. Defendant's second assignment fails to meet the criteria for plain error review because this is not a case where the record "is devoid of any evidence" from which the court could find that defendant's criminal conduct resulted in economic damages to the victim. State v. Martinez , 250 Or. App. 342, 344, 280 P.3d 399 (2012). In this case, there is evidence in the record that supports a logical inference that defendant caused the damage to the victim's moped while he was unlawfully exercising control over the moped. Therefore, the error is not obvious or apparent on this record, and we reject defendant's second assignment of error. ORAP 5.45.

The "suspicious" bill of sale was entered into evidence as the state's Exhibit 2.

According to the arresting officer in Korth , " 'jiggle keys' are 'regular old keys that * * * car thieves will file down * * * because if they file [a key] down a certain way, they're able to stick it into the ignition and just jiggle it around and start cars.' " 269 Or. App. at 239 n. 1, 344 P.3d 491 (brackets and second ellipsis in Korth ).