TOOKEY, J.
*218 Defendant appeals a judgment of conviction for the unauthorized use of a vehicle (UUV), ORS 164.135, assigning error to the trial court's denial of his motion for judgment of acquittal.[1] On appeal, defendant argues *942 that "the state's evidence in this case was insufficient to support a reasonable inference that defendant had actual knowledge that the Subaru was stolen when he possessed it." We conclude that a rational factfinder could have found that the state proved beyond a reasonable doubt that defendant knew this vehicle was stolen and, therefore, the trial court did not err when it denied defendant's motion for judgment of acquittal. Accordingly, we affirm.[2]
When reviewing the denial of a motion for judgment of acquittal, we review the facts in the light most favorable to the state and draw all reasonable inferences in the state's favor to determine "whether any rational trier of fact, accepting reasonable inferences and making reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt." State v. Lupoli , 348 Or. 346, 366, 234 P.3d 117 (2010). We present the facts consistently with that standard.
*219 The victim in this case was the owner of a 1997 Subaru Legacy. One weekend, the victim left her Subaru parked on the street in front of her friend's house in Portland on Friday night to attend an event in Seattle. The victim returned on Sunday to find that her Subaru was missing, and the victim reported her vehicle as stolen because she had not given anyone else permission to use her vehicle.
Several weeks after the victim had reported her vehicle as stolen, Officer Powell responded to a call for assistance by some employees at Fred Meyer. The employees directed Powell's attention to defendant, his co-defendant (Jones), and a 1997 Subaru Legacy. When Powell approached the Subaru, Powell noticed that there were no license plates on the Subaru and that the Subaru only had a temporary trip permit. Based on Powell's training and experience as a police officer, Powell explained that the absence of license plates and the use of a temporary trip permit is a suspicious characteristic for a vehicle because there is no license plate that an officer can readily use to conduct a record check to find out if the vehicle is stolen. Instead, if there is no license plate, the officer uses the vehicle identification number (VIN) to conduct a record check, but that requires going into the vehicle, or looking through the windshield of the vehicle, to find the VIN. Powell located the VIN by looking through the window of the Subaru and relayed the VIN to dispatch. Dispatch advised Powell that the Subaru had been reported stolen.
When Powell contacted defendant, Powell noticed that defendant was wearing a computer chip on a lanyard around his neck. Defendant was taken into custody and officers removed the lanyard with the computer chip from around defendant's neck and gave it to Officer Wall, who was collecting the evidence in this case.
Wall, who had previously been employed as a detective on an auto theft task force in Texas, and received specific training on vehicle theft, knew that "[e]arly 90's to late 90's" Subarus are a target for car thieves because they can be started with a "jiggle key"[3] or by using an electronic *220 ignition bypass system that allows car thieves to start the vehicle by inserting a computer chip to bypass the ignition and flipping a relay switch to engage the starter.[4] Wall noticed that the computer chip *943 that defendant had on the lanyard around his neck "was the chip key for th[e] relay switch" on the ignition bypass system on the driver's side of the Subaru. The victim's Subaru did not have an electronic ignition bypass system before it was stolen. Wall knew from his training and experience that ignition bypass systems are not installed any more for any "legitimate security purpose," but are "typically used as a way to clean up a hotwire, so that you don't have a mess of wires hanging out from underneath the dash" to make the vehicle "look[ ] a little more legitimate." Based on the "wiring with the tape" on the ignition bypass system, the relay switch for the starter, and the lack of any legitimate key for the Subaru, Wall determined that this was the type of ignition bypass system that is "common with stolen vehicles" and that defendant would not "need the actual metal key that unlocks the doors and cranks the ignition at all" in order to drive the Subaru. Wall also discovered from defendant's Facebook page that defendant was mechanically inclined and had knowledge of how to work on vehicles.
As Wall continued his investigation, Wall also observed the absence of any license plates on the Subaru. Wall explained that that raised his suspicion that the Subaru was stolen because "the easiest way for an officer to check and identify whether a vehicle is stolen" is to "[r]un the license plate" because an officer can do that from a computer inside of their own car. Wall stated that "the temporary tag was immediately recognizable as being fictitious" because "some of the numbers had been altered and there was actually another piece of paper that was taped over the top of one of the numbers that had another number written on it." Wall also noted that it was apparent that "someone *221 * * * added the word 97 and then the word Legacy, [and that] they ha[d] overwritten whatever was underneath it" on the "fishy" temporary trip permit.
When Wall removed the temporary trip permit from the back window of the Subaru, Wall discovered that the original license plates for the Subaru that had been reported stolen were inside the car. Additionally, Wall found a different expired license plate that did not belong to the victim and that "had previously been on another stolen vehicle." Wall found three sets of "jiggle keys" on individual key rings in a pocket on the driver's side door of the Subaru that did not belong to the victim. Wall also found a backpack belonging to defendant that contained blank Department of Motor Vehicles (DMV) forms and a notebook with an "imprint of writing that had been done on a previous sheet of paper." Wall used fingerprint powder to determine what had been written on the previous sheet of notebook paper and discovered that it was a purported bill of sale for the Subaru that listed Jones as the buyer but did not "have any relation to the actual owner of the car." Finally, Wall, who had also been trained to detect fraudulent DMV documents, noted that the purported bill of sale would help to "facilitate the transfer [of the Subaru to a new owner] with the DMV" and that there was a "suspicious" DMV transaction receipt in the Subaru that listed Jones as the owner of the Subaru. The transaction receipt was not submitted by the victim to the DMV, and one of the VIN numbers had been changed from a four to a seven to circumvent the DMV's process to determine whether the Subaru had been "flagged" as stolen.[5]
The police contacted the victim and, when the victim went to Fred Meyer and saw her vehicle, the victim noticed that "the hood of the car had been changed * * * [because] it was green [instead of gray] and had a scoop * * * on it," the rear windows had been tinted, some of the decals had been removed, the license plates had been removed, and the ignition bypass, wiring, and switch had been added.
*222 Additionally, the victim did not use *944 a computer chip, like the one found on defendant's lanyard, to operate her vehicle.
As noted above, defendant moved for a judgment of acquittal on the UUV and PSV charges, arguing that "the jury cannot infer [from that evidence,] even in the light most favorable to the state, that they have proven * * * the knowledge aspect of these charges." The state contended that, "in the light most favorable to the state, * * * [i]t is apparent, based on the circumstantial evidence, * * * that the defendant, as the operator and occupant and possessor of this vehicle knew and frankly had to know that this was a stolen car [that] he did not have permission to have." The trial court denied defendant's motion for judgment of acquittal and the jury found defendant guilty of UUV and PSV.
On appeal, defendant assigns error to the trial court's denial of his motion for judgment of acquittal, reprising his argument that the state failed to prove that defendant actually knew that the Subaru was stolen. See State v. Bell , 220 Or. App. 266, 268-69, 185 P.3d 541 (2008) (because the indictment for UUV and PSV alleged that the defendant acted knowingly, "the state was required to prove that [the] defendant actually knew that the car was stolen" (emphasis in original)). Defendant compares the circumstances of this case to Bell , 220 Or. App. 266, 185 P.3d 541, State v. Shipe , 264 Or. App. 391, 332 P.3d 334 (2014), and State v. Korth , 269 Or. App. 238, 344 P.3d 491 (2015), cases in which we concluded that the evidence was insufficient to support an inference that the defendants knew that those vehicles were stolen. In response, the state contends that those cases are distinguishable "because this case involves more and different circumstantial evidence that, when viewed together, would allow a factfinder to conclude beyond a reasonable doubt that defendant knew the vehicle was stolen."
"Thus, we must determine whether, viewing the evidence in the light most favorable to the state, a rational factfinder could have found that the state proved beyond a reasonable doubt that defendant knew the [Subaru] was stolen." Korth , 269 Or. App. at 243, 344 P.3d 491. "The state may prove a defendant's knowledge with circumstantial evidence and reasonable inferences flowing from that evidence." Id .
*223 "However, an inferred fact 'must be one that a rational factfinder can be convinced follows beyond a reasonable doubt from the underlying facts.' " Id . (quoting Bell , 220 Or. App. at 270, 185 P.3d 541 ). "Evidence is 'insufficient to support an inference when the conclusion to be drawn from it requires too great an inferential leap-that is, when the logic is too strained,' or when it 'requires the stacking of inferences to the point of speculation.' " Id . (quoting State v. Bivins , 191 Or. App. 460, 466-68, 83 P.3d 379 (2004) ). "Whether the evidence supports a particular inference is a question of law." Id .
Our opinions in other UUV and PSV cases are instructive and, in light of the parties' arguments, we begin our discussion with a brief overview of our reasoning in Bell , Shipe , and Korth . We recently summarized the holdings of Bell , Shipe , and Korth , in State v. Peirce , 296 Or. App. 829, 440 P.3d 98 (2019).
In Bell , Shipe , and Korth , we concluded that the state failed to prove that the defendants knew that those vehicles were stolen where the state did not adduce any evidence "about the physical appearance of the vehicle that would have indicated to the defendant[s] that the vehicle[s] had been stolen" and where the other evidence that the state presented "was unrelated to any wrongdoing with the stolen vehicles in those cases." Peirce , 296 Or. App. at 838-40, 440 P.3d 98 (citing Korth , 269 Or. App. at 247, 344 P.3d 491 (the defendant operated the truck with a valid key and there was nothing about the appearance of the truck that would have indicated to the defendant that it had been stolen, "such as evidence of damage to the truck's locks, windows, or ignition"), Shipe , 264 Or. App. at 393, 397, 332 P.3d 334 (noting that the truck's "ignition was in working order" and the defendant did not operate the truck with a key that appeared "suspicious," and that the record did not include any "evidence about whether the windows, locks, ignition, or wiring had been damaged or tampered with at all, much less in a way that would have been noticed by anybody using *945 the truck"), and Bell , 220 Or. App. at 271, 185 P.3d 541 (noting the absence of evidence of "tampering or foul play" with the vehicle)). See also State v. Shuneson , 132 Or. App. 283, 286, 888 P.2d 90 (1995) (observing that there "was nothing unusual about the appearance of the vehicle, such as hot *224 wires, that would have indicated to defendant that it was stolen").
Conversely, in Peirce , 296 Or. App. at 840, 440 P.3d 98, there was evidence that was related to "wrongdoing" with the stolen moped. In that case, the defendant was mechanically inclined, the moped's ignition had been damaged so that it would start with a screwdriver or any key, the defendant did not have a valid key, the moped's appearance had been altered by, among other things, the removal of the moped's license plate, and the defendant possessed a "highly suspicious bill of sale." Id . at 838-40, 440 P.3d 98. We concluded that,
"[u]nlike in Korth and Shipe , where there was evidence of drugs, stolen property, 'jiggle keys,' and a 'crime committing kit'-evidence that was unrelated to any wrongdoing with the stolen vehicles in those cases-here, * * * the 'brute forced' ignition, the removal of the license plate, the alterations to the moped's appearance, the 'highly suspicious' bill of sale, and the 'very cheap' price would permit a factfinder to logically infer that defendant actually knew that this moped was stolen because that evidence indicates that the moped itself was stolen."
Id . at 840-41, 440 P.3d 98 (emphasis in original).
We conclude that the evidence in this case is more like the evidence presented in Peirce . The evidence presented in this case is analogous to the evidence we found sufficient to uphold the UUV conviction in Peirce , because "there is evidence of 'tampering' and 'foul play' that is 'relevant to defendant's knowledge' that this [Subaru] was stolen." Id. at 838, 440 P.3d 98 (quoting Bell , 220 Or. App. at 271-72, 185 P.3d 541 ).
First, defendant was mechanically inclined, the Subaru's ignition had been electronically bypassed, and defendant did not have a valid key for the Subaru. Instead of having a valid key, defendant possessed a computer chip that would allow him to bypass the Subaru's ignition and start the Subaru without a key, which indicates that defendant was exercising control over the Subaru and was aware of the ignition bypass system. Additionally, the ignition bypass system that had been installed in the Subaru is no longer used for any "legitimate security purpose," is "used as a way to clean up a hotwire," and is "common [in] stolen vehicles."
*225 Because defendant did not have a valid key to operate the Subaru and, instead, possessed a computer chip to operate the Subaru, we conclude that the ignition bypass, additional tape and wiring, and relay switch are "the type of obvious damage that would indicate to defendant that this [Subaru] was stolen." Peirce , 296 Or. App. at 839, 440 P.3d 98 (citing Korth , 269 Or. App. at 247, 344 P.3d 491 (noting that evidence of obvious damage to the ignition would indicate to a user of a vehicle that the vehicle is stolen, especially when the defendant does not use a valid key to operate the vehicle)).
Second, the license plates had been removed and were found inside the Subaru with a different expired license plate that "had previously been on another stolen vehicle." Furthermore, "the temporary tag was immediately recognizable as being fictitious" because "some of the numbers had been altered and there was actually another piece of paper that was taped over the top of one of the numbers that had another number written on it." Moreover, it was also apparent that "someone * * * * * * added the word 97 and then the word Legacy, [and that] they ha[d] overwritten whatever was underneath it" on the "fishy" temporary tag. And, like the moped in Peirce , the Subaru's appearance had been altered by changing the hood, removing decals, and tinting the rear windows. That evidence also supports a logical inference that defendant knew that this Subaru was stolen. See Peirce , 296 Or. App. at 839, 440 P.3d 98 (the "removal of the license plate from the victim's moped, along with other accessories," indicated that the defendant had "altered the moped's appearance because he knew that the moped was stolen"); State ex rel. Juv. Dept. v. Hal , 168 Or. App. 76, 78-79, 7 P.3d 535 (2000) (driver of a stolen vehicle "at least had reason to believe" that the vehicle was stolen, in part, because *946 the interior had been stripped, wires hung from where the stereo had been, and the vehicle had out-of-state license plates).
Third and finally, defendant was in possession of a notebook that had been used to write the purported bill of sale for the Subaru that would help "facilitate the transfer [of the Subaru] with the DMV," but the bill of sale did not "have any relation to the actual owner of the car." Additionally, *226 there were blank DMV forms in defendant's backpack and a "suspicious" DMV transaction receipt was found in the Subaru that was not submitted by the victim and that had one of the VIN numbers changed to circumvent the DMV's process to determine if the Subaru had been "flagged" as stolen. See Peirce , 296 Or. App. at 840-41, 440 P.3d 98 (the defendant's possession of a "highly suspicious" bill of sale that identified the seller only as "Jerry W.," and not the actual owner of the moped, and the defendant's acknowledgment that the bill of sale looked "suspicious," supported a logical inference that the defendant knew that the moped was stolen); Shipe , 264 Or. App. at 398, 332 P.3d 334 (observing that the absence of the owner's vehicle registration or insurance could indicate that the defendant knew that the vehicle was stolen, if the defendant was aware of the missing registration and insurance card).
In sum, the evidence specified above, viewed as a whole and in the light most favorable to the state, in addition to the three sets of jiggle keys found in a pocket on the driver's side door of the car, would allow a rational factfinder to find that the state had proved beyond a reasonable doubt that defendant knew that the Subaru was stolen. But see Korth , 269 Or. App. at 247, 344 P.3d 491 (concluding that the state failed to prove that the defendant knew that the truck was stolen where the defendant operated the truck with a valid key and not the "jiggle keys" found in the back of the truck). Accordingly, the trial court did not err when it denied defendant's motion for judgment of acquittal.
Affirmed.

ORS 164.135(1)(a) provides that "[a] person commits the crime of unauthorized use of a vehicle when" the "person takes, operates, exercises control over, rides in or otherwise uses another's vehicle * * * without consent of the owner." In cases such as this one, where the state alleges that the defendant acted knowingly, "[t]hat person must know that he or she does not have the owner's consent." State v. Gibson , 268 Or. App. 428, 430, 342 P.3d 168 (2015). In other words, that person must "actually" know that the vehicle is stolen. State v. Korth , 269 Or. App. 238, 242, 344 P.3d 491 (2015).
Defendant was also found guilty of possession of a stolen vehicle (PSV), ORS 819.300, but the trial court merged that guilty verdict into the guilty verdict for UUV, resulting in a single conviction for UUV. Defendant's first and second assignments of error seek reversal of the jury verdicts finding him guilty of UUV and PSV. Because defendant's challenge is limited to whether the state provided sufficient evidence to establish a shared element of those crimes, as charged in the indictment-that defendant knew that the vehicle was stolen-our analysis of that issue resolves defendant's first and second assignments of error.

After the initial briefing was complete, defendant filed a supplemental brief that included a supplemental assignment of error that assigned error to the trial court's instruction to the jury that it could return a nonunanimous verdict. Defendant contends that the Sixth and Fourteenth Amendments to the United States Constitution require unanimous jury verdicts. We reject that argument on the merits without further discussion.

Jiggle keys are "a very common tool in auto theft." Jiggle keys are normal keys that "have been shaved down, * * * to round off specific edges" so the keys can start a number of similar vehicles from the same era by "jiggl[ing] the [key in] the ignition until it will rotate over."

Wall explained the evolution of the legitimate use of electronic ignition bypass systems:
"Just prior to the evolution of keys including chips in them, some vehicle manufacturers and dealerships would offer an option for a vehicle to be outfitted with a security device that would * * * take a computer chip that you would now find in a key, and have it as an additional accessory that would fit into * * * [a] slot [underneath the dash.]"

Photographs of the computer chip key, the ignition bypass system, the "fictitious" temporary trip permit, the "jiggle keys," a copy of the purported bill of sale, and the "suspicious" DMV transaction receipt were all entered into evidence as exhibits for the state.