546 October 29, 2025 No. 940

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID TINO GUILLEN,
*Defendant-Appellant.*

Malheur County Circuit Court
22CR59233; A183618

Erin K. Landis, Judge.

Argued and submitted July 9, 2025.

Brett Allin, Deputy Public Defender, argued the cause for appellant. Also on the brief were Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Emily N. Snook, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

JOYCE, J.

Reversed.

Hellman, J., dissenting.

## JOYCE, J.

Defendant appeals from a judgment convicting him of unauthorized use of a vehicle (UUV). In a single assignment of error, defendant challenges the trial court's denial of his motion for judgment of acquittal, arguing that there was insufficient evidence to prove that he "knowingly" rode in a truck without the owner's consent. We agree. Accordingly, we reverse.

When reviewing the denial of a motion for judgment of acquittal, we view the evidence in the light most favorable to the state to determine whether a rational factfinder could have found that the essential elements of the crime were proven beyond a reasonable doubt. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Given the question raised on appeal, *i.e.*, whether a rational trier of fact could have found that defendant knew that he was riding in a truck without the owner's consent, we focus on the facts relevant to that question.

Between 2:30 p.m. on December 10, 2022, and 9:40 a.m. the next morning, at least two individuals broke into the shop on Winegar's property, ransacked it, and stole his pickup truck. While investigating the theft, Officer Rand saw tire tracks in the snow leading up to the shop and footprints going around the side of the shop into a window, neither of which had been there before the theft. Based on those markings, Rand concluded that "at least two" people were involved in stealing the truck—one to drive the vehicle used to reach the property, and another to drive away the stolen truck. Rand entered the truck's information into a national database of stolen vehicles.

Later in the afternoon on the same day that Winegar's son reported the truck missing, Michael McGourty was driving on a dirt road about an hour away from Winegar's property when he saw a truck broken down in the middle of the road.[1] McGourty saw two men near the truck—one inside it and one underneath it—and he stopped to ask if they needed help. The men declined and said that their friend was coming to pick them up.

---

[1] The truck that McGourty saw turned out to be Winegar's stolen vehicle.

About 45 minutes later, McGourty drove by them again and renewed his offer of help, but the men still declined. At that point, McGourty noted the license plate number and reported the truck to the sheriff's department because he was concerned that the truck's position in the middle of the rural road presented a hazard. He later saw the men walking away from the truck and into town.

Deputy Hale and Deputy Rice responded to McGourty's call about the truck and dispatch informed them that it was stolen. When the deputies arrived at the scene, the two men were no longer at the truck and McGourty returned to provide a statement. Based on the descriptions that McGourty provided, Hale and Rice split up and drove toward town to try to locate the men.

Hale eventually located defendant and Erik Sanchez walking alongside the road, and he noticed that they matched McGourty's descriptions of the men he had seen with the truck. Hale then attempted to conduct a "felony stop" of defendant and Sanchez, which consisted of him drawing his firearm and ordering the men to "get down on [their] knees" and show their hands "or else." Sanchez complied with Hale's orders, but defendant fled down a snowy embankment and into a nearby field.

Hale handcuffed Sanchez and searched his person. During his search, Hale found binoculars, several wallets, miscellaneous tools, a methamphetamine pipe, and a walkie-talkie. After Hale secured Sanchez, he and the other responding officers began looking for defendant.

One of the officers followed defendant's footprints in the snow and found a coat tucked under a shrub about 100 yards from the road. Beyond that shrub, it appeared to the officer that defendant had crawled because there were arm marks in the snow. The officer followed those tracks and discovered defendant curled up under another shrub, shivering, with hypothermia setting in.

Due to defendant's pre-stage hypothermia, an officer had to assist defendant with walking, and the officer led defendant back to a patrol car to warm up. The officers called an ambulance to the scene to provide hypothermia

treatment. Once law enforcement identified defendant, they did not find any warrants or other alerts on him. They also searched defendant's clothing and did not find any concerning items or paraphernalia on his person.

The next day, the police released the truck to Winegar. When Winegar retrieved his truck, he noticed that there were several items on the bed of the truck that had not been there before including, tires, battery chargers, a mag drill, and a plasma cutter. The plasma cutter was large enough that it likely required two people to lift it onto the truck.

After the police released the truck to Winegar, law enforcement located Sanchez's car, which had broken down in the middle of a road about 20 miles away from where Winegar's truck had been found.

Based on those events, and as relevant here, the state indicted defendant for UUV.[2] The state alleged that defendant "did unlawfully and knowingly take, operate, ride in, and / or exercise control over *** a truck *** without the consent of the owner."

After the state's case-in-chief, defendant moved for a judgment of acquittal, arguing that the state's evidence was insufficient to prove an element of UUV—that is, defendant's actual knowledge that he was riding in the truck without the owner's consent. The court denied defendant's motion.

The court found defendant guilty of UUV. In issuing its verdict, the court identified several facts that were significant to its ruling.

- First, the court found that it was significant that Sanchez and defendant declined McGourty's offers of assistance. In the court's view, given the snowy conditions and their remote location, "most people in that situation, unless they knew that they were up to something, would have taken Mr. McGourty's help."

---

[2] The state also charged defendant with third-degree escape and possession of a stolen vehicle. The state dismissed the escape charge pre-trial, and the court acquitted defendant of possession of a stolen motor vehicle because it found that the state had failed to prove that defendant drove or possessed the truck.

- Second, the court stated that it was significant that "there was really no one else in the area" and that they were "wandering around on the shoulder of a snowy highway in the middle of the night." The court clarified that this was significant because it was "[n]ot exactly a safe place for people to be walking around" and because "that shows a certain amount of desperation in terms of trying to get out of a situation."

- Third, the court stated that it was important that two vehicles were found—the stolen truck and Sanchez's vehicle—because "[t]here [was] no way that Mr. Sanchez could have gotten his car to [the location where it was found] and [the stolen truck] to [where it had broken down] by himself." The court found that that evidence "clearly indicate[d] *** that there was more than one person involved in moving those two vehicles."

- Fourth, the court noted that it was important that the plasma cutter found on the truck was so large that it was "[n]ot one that could be easily lifted by one man" because that also suggested that lifting it there "would more likely have been a two-man job."

- Fifth, the court found it significant that there were two sets of tire tracks left in the snow at the Winegar property because that also served as a "clear indication" that there was a "two-man job going on," which was "consistent" with two men being found with the stolen vehicle.

- Finally, the court highlighted that it was "extremely significant" that defendant decided to run and hide in freezing conditions when he was contacted by the police. In fact, the court stated that "absent his actions when [he was] found by the police, [the court did not] think [it] *** could find [defendant] guilty." In the court's view, defendant's flight from the police was "a clear indication of guilt" and signaled that defendant "clearly knew that something was going on with this vehicle when he was contacted by the police."

Based on that evidence, the court concluded that defendant "knowingly rode in a vehicle *** without the consent of the owner" and, consequently, that he was guilty of UUV. In so concluding, the court noted that it was "not sure that the [state had] proven that [defendant was] the one that took it," but that the state had met its burden to prove

that "he rode in it" and that "he clearly knew something was afoot with that vehicle based upon his actions when the police officers contacted them."

On appeal, defendant assigns error to the trial court's denial of his motion for judgment of acquittal, arguing that the state failed to prove UUV because the evidence did not establish an element of that crime—that defendant knowingly rode in the truck without the owner's consent. *See* ORS 164.135(1)(b) (a person commits the crime of UUV when they "knowingly ride[] in another's vehicle *** know[ing] that the owner of the vehicle *** does not consent to the person's riding" therein).[3] In response, the state contends that defendant's actions, including his flight and refusal of offered assistance, showed that defendant knew he did not have the owner's consent to ride in the truck. Because we conclude that a rational trier of fact could not have found beyond a reasonable doubt that defendant knew that he was riding in the truck without the owner's consent, we reverse.

As relevant to this appeal, a person commits the crime of UUV when (1) "[t]he person knowingly rides in another's vehicle," (2) "the person knows that the owner of the vehicle *** does not consent to the person's riding in the vehicle," and (3) "[t]he owner or an authorized user of the vehicle *** did not consent to the person's riding in the vehicle." ORS 164.135(1)(b). Accordingly, to convict a defendant under that theory of UUV, the state is required to prove

---

[3] The current UUV statute, as amended in 2019, distinguishes between two categories of alleged conduct: (1) taking, operating, exercising control over, or otherwise using a vehicle, and (2) riding in a vehicle. ORS 164.135(1)(a)-(b). When the state alleges that a person took, operated, exercised control over, or otherwise used a vehicle, the statute requires the state to prove that the person acted with a *reckless* mental state as to the owner's lack of consent. ORS 164.135(1)(a). In contrast, when the state proceeds under a rides-in theory, the statute—now in a separate subsection—requires the state to prove that the person *knowingly* lacked the owner's consent. ORS 164.135(1)(b). Here, despite that distinction, the state alleged in its indictment that defendant "did unlawfully and *knowingly* take, operate, ride in, and / or exercise control over *** a truck *** without the consent of the owner." (Emphasis added.). On appeal, the parties agree that, because the state charged UUV only as "knowingly," the state was required to prove that defendant had a knowing mental state as to the owner's lack of consent. Furthermore, because the pre-2019 version of the statute required a knowing mental state for both categories of conduct, case law interpreting the former statute remains relevant to our analysis.

beyond a reasonable doubt that the defendant knew that they did not have the owner's consent to be in the vehicle.

The state may prove a defendant's knowledge through circumstantial evidence and the reasonable inferences that follow from it. *See Delgado v. Souders*, 334 Or 122, 135, 46 P3d 729 (2002) (an element of a criminal offense may be established by "circumstantial evidence and reasonable inferences arising from such evidence"). However, an inferred fact "must be one that a rational factfinder can be convinced follows beyond a reasonable doubt from the underlying facts." *State v. Bell*, 220 Or App 266, 270, 185 P3d 541 (2008). Evidence is insufficient to support an inference when the conclusion depends on a leap in logic that is too large—either because the reasoning is overly strained or because it relies on stacking multiple inferences "to the point of speculation." *State v. Bivins*, 191 Or App 460, 466-68, 83 P3d 379 (2004). Whether the evidence supports a particular inference is a question of law. *Delgado*, 334 Or at 135.

Summarized, the evidence viewed in the light most favorable to the state is that defendant and Sanchez were found with the stolen truck within roughly 24 hours of its theft and approximately an hour's drive from where it was taken. Given the tire marks that were left at Winegar's property, at least two people were involved in the theft of the truck: one to drive a vehicle to and from the property and another to drive the stolen truck away. Despite snowy conditions and being in a remote location, defendant and Sanchez refused McGourty's two offers to help with the broken-down truck, stating that they had a friend coming to help them. Sanchez's car was found in the middle of a road 20 miles away from where the stolen truck broke down. Finally, when the police approached defendant and Sanchez, defendant fled and hid in the snow to the point of developing pre-stage hypothermia.

According to the state, that evidence supports a reasonable inference that "defendant assisted Sanchez with stealing the truck" and that he therefore "knew that the vehicle was stolen." We disagree. Although the evidence indicates that at least two people were involved in stealing the truck, the state did not present any evidence that either

defendant or Sanchez were those people. And while defendant and Sanchez were later found with the stolen truck, their presence with the vehicle alone is insufficient to infer that they took it. *See State v. Huerta-Contreras*, 336 Or App 251, 560 P3d 728 (2024), *rev allowed*, 373 Or 736 (2025) (concluding that presence in the driver's seat of a reported-stolen car, by itself, does not support inference of the defendant knowing or acting with a reckless disregard for the fact that the vehicle was stolen).

Furthermore, even assuming that the truck was stolen shortly before 9:00 a.m. and discovered that same afternoon about an hour away, several hours elapsed during which the vehicle could have changed hands. The state introduced no evidence showing how or when defendant came into possession of the truck nor any evidence that the truck was damaged such that defendant would have had reason to believe that it was stolen and that he was riding in it without the owner's consent. *Cf. State ex rel Juv. Dept. v. Hal*, 168 Or App 76, 78-79, 7 P3d 535 (2000) (driver of a stolen vehicle "at least had reason to believe" that the vehicle was stolen, in part because the interior had been stripped and wires hung from where the stereo had been). Without more—such as inconsistent statements, visible damage to the vehicle that defendant recognized as indicative of theft, or any evidence linking defendant to the scene of the theft—mere possession, even under suspicious circumstances, does not establish that defendant knew the vehicle was stolen and that he was thus riding in it without the owner's consent. *See State v. Korth*, 269 Or App 238, 247, 344 P3d 491 (2015) (insufficient evidence to support finding that defendant knew the truck was stolen where defendant operated the truck with a valid key and there was nothing about the appearance of the vehicle that would have indicated to the defendant that it had been stolen, "such as evidence of damage to the truck's locks, windows, or ignition"); *State ex rel Juv. Dept. v. Mitchell*, 142 Or App 40, 42-44, 920 P2d 1103 (1996) (insufficient evidence to establish the youth's knowledge that the vehicle he was riding in was stolen, despite the fact that the vehicle's door locks were punched and the ignition was damaged, because there was no evidence that the youth perceived that damage); *cf.*

*State v. Peirce*, 296 Or App 829, 840-42, 440 P3d 98 (2019) (concluding that, in a sale of a stolen vehicle, evidence of, among other things a "very cheap price," damage to the ignition, and inconsistent statements, was enough together to allow a factfinder to infer the defendant's knowledge that the vehicle was stolen).

Indeed, the trial court itself acknowledged the weakness of the inference that defendant participated in the theft, stating, "I'm not sure that the State's proven that [defendant] is the one that took [the truck]." We agree and find that the conclusion that the state urges—that "defendant assisted Sanchez with stealing the truck" and therefore "knew that the vehicle was stolen" and that he was riding in it without the owner's consent—requires a "stacking of inferences to the point of speculation" and a leap in logic too great to satisfy the standard of proof beyond a reasonable doubt. *See Bivins*, 191 Or App at 468.

The state further contends that "defendant's flight and other actions permitted the inference that he knew that the vehicle was stolen" and that he did not have the owner's consent to ride in the truck. To be sure, and as we have previously explained, flight may be relevant as circumstantial evidence of a guilty mind. *State v. Minchue*, 173 Or App 520, 524, 24 P3d 386 (2001) ("Oregon courts have long held that evidence of flight is relevant as circumstantial evidence of guilty knowledge, which is some evidence of guilt."); *see also State v. Raney*, 331 Or App 693, 705-06, 547 P3d 172 (2024) ("evidence of a person's flight is admissible as relevant to show consciousness of guilt"). But that principle does not extend so far as to support a specific finding that defendant knew the truck was stolen. In other words, although flight may reflect a generalized consciousness of guilt or fear of legal trouble, it does not, on its own, reveal *what* the person fleeing actually knew. *See State v. Edwards*, 337 Or App 196, 199, 562 P3d 1114 (2025) (concluding that defendant's flight did not support a reasonable inference that defendant knew he had committed the specific crime being investigated, because the flight was not tied to any conduct indicating knowledge of that offense).

That reasoning applies with even greater force here. When the officer approached defendant, he did not mention the truck or otherwise indicate that it was stolen. Instead, the officer drew his weapon, pointed it at defendant and Sanchez, and ordered them to "[s]how me your hands or else" and "[g]et down on your knees." In the absence of any statement connecting the officer's commands to the vehicle or any other evidence shedding light on what motivated defendant's flight, there is no basis to infer that defendant fled because he knew the truck was stolen, as opposed to some other reason, such as fear of the police. In the absence of any statements or conduct tying defendant's flight to knowledge of the truck's stolen status and the owner's lack of consent that defendant ride in it, defendant's behavior is insufficient to allow a rational factfinder to find that the state proved the mental state that UUV requires beyond a reasonable doubt. *See State v. Shuneson*, 132 Or App 283, 287, 888 P2d 90 (1995) (holding that a passenger's knowledge that the vehicle she was riding in was stolen could not be inferred beyond a reasonable doubt merely because the vehicle was being driven recklessly and the defendant attempted to flee from the police).

Finally, the state also contends that, considering the evidence as a whole, a rational factfinder could infer that defendant knew that he did not have the owner's consent to ride in the vehicle. But none of the facts, whether alone or stacked, meaningfully ties defendant to the theft or otherwise demonstrates that defendant had the requisite knowledge. At most, they raise a suspicion—insufficient to support a finding beyond a reasonable doubt of the requisite mental state.

In sum, the record does not include evidence legally sufficient to support a finding beyond a reasonable doubt that defendant actually knew that he did not have the owner's consent to ride in the truck, even when that evidence is viewed as a whole and in the light most favorable to the state. Accordingly, the trial court erred in denying defendant's motion for judgment of acquittal on UUV.

Reversed.

**HELLMAN, J.,** dissenting.

I respectfully dissent. This record contains suffi-
cient evidence for the trial court to determine beyond a rea-
sonable doubt that defendant committed the crime of unau-
thorized use of a vehicle (UUV), ORS 164.135(1)(b). I agree
with the majority that under that statute, the state had to
prove that defendant knew he "did not have the owner's con-
sent to be in the vehicle." 344 Or App at 551-52. I disagree,
however, that a determination of guilt in this case would
require impermissible inference stacking, that the record
contained insufficient evidence to support a conviction, and
that the trial court erred when it denied defendant's motion
for judgment of acquittal on the UUV charge. I take no issue
with the majority's clear and correct explanation of the con-
trolling law. I simply part ways with its the application of
the law on these facts, as set forth below.

The key events occurred on December 10 and
December 11, 2022. The state presented evidence that
the weather conditions on those dates were "snowy" and
"slushy" "wintertime weather." On the morning of December
11, a law enforcement officer responded to the Winegar
property after a family member reported a stolen vehicle.
The Winegar property is located in Grant County, approx-
imately two miles from Prairie City, Oregon. Prairie City
has a population of roughly 500 people.[1] Because Winegar
was in the excavation business, the property contained "a
lot of equipment parked out in [a] shop yard." On December
10 or December 11, Winegar's flatbed truck was stolen from
the shop on his property, and the shop was "ransacked."

At around 3:00 or 4:00 p.m. on December 11, when
the weather was still "terrible" and "snowy," McGourty
encountered defendant, Sanchez, and the truck near Brogan,
Oregon. State's Exhibit 2, a map of the area, indicates that

_____

[1] I appreciate that the prosecutor offered into evidence two maps of the area
and asked the witnesses specific questions about the distances between the loca-
tions, those areas' populations, and the witnesses' observations about the com-
munity. Although those facts may have been common knowledge and obvious to
the trial participants, the prosecutor—wisely—tried the case without assuming
that the factfinder knew those facts and would evaluate the evidence accordingly.
Those maps and that background testimony provided important context for the
witness testimony about the events at issue and were invaluable in my assess-
ment of this case.

Brogan is approximately the same size as Prairie City.
McGourty observed that the truck was "pretty much in the
middle of" Hill Road and "not [in] a real safe spot." Hill Road
is a "dirt road" that is "[p]art of the pasture for cattle" with
"cows all around." Because it is "a local road" that is "a few
miles" from the highway, Hill Road is not "traveled by peo-
ple who are using the highway."

When the men told him that "they had somebody
coming to pick them up," McGourty offered to tow the truck
"down to the highway because the cell service" in the Hill
Road area was "pretty spotty." After the men declined,
McGourty left. When he returned about 45 minutes later,
the men were still with the truck. McGourty noticed that
they "had jackets on" and was "concerned for their well-
being *** because it was wintertime." McGourty then saw
the men abandon the truck and walk north "down the county
road." According to McGourty, during hunting season, it
was common to see "some strange rigs around." However,
during winter, it was "not very common at all" for individ-
uals to take walks in Brogan "in those conditions" because
the weather was "terrible" and "snowy."

After McGourty contacted law enforcement and
described the two men, Malheur County Deputy Hale
responded, found the truck, and spoke with McGourty. Hale
traveled north on the highway toward Brogan "to see if [he]
could locate anybody walking." Hale then "located two sub-
jects that matched the description" that McGourty had pro-
vided and activated his emergency lights. After Hale drew
his weapon and ordered the men to "show me your hands
or else!" defendant fled and hid for so long that he became
hypothermic. At trial, three law enforcement officers who
had investigated the theft—including Hale—testified that
they did not see any other individuals walking on the high-
way near Brogan that day.

On December 13, law enforcement found a vehicle
registered to Sanchez in Ironside, Oregon, approximately
20 miles from the location where Hale had located defen-
dant and Sanchez. That vehicle was parked in the middle
of the road about a mile away from the highway. When
Winegar went to Brogan to recover his truck, he discovered

that the starter and the clutch had been damaged and were inoperable.

In concluding that the evidence was legally insufficient to support a conviction, the majority rejects the state's argument that "defendant's flight and other actions permitted the inference that he knew the vehicle was stolen." Relying on our opinion *State v. Huerta-Contreras*, 336 Or App 251, 560 P3d 728 (2024), *rev allowed*, 373 Or 736 (2025), the majority concludes that defendant and Sanchez's "presence with the vehicle alone is insufficient to infer that they took it." 344 Or App at 553. However, this case is distinguishable from *Huerta-Contreras* for several reasons. Significantly, unlike in that case, defendant was not merely "sitting in the driver's seat of a stolen car." *Huerta-Contreras*, 336 Or App at 253. Rather, the record contains evidence of defendant's deliberate conduct, including repeated refusals for help and for transport to the highway while it was snowing, abandoning the truck in a "cow pasture," and flight from police.

In addition, the circumstances of defendant's conduct here differ from the circumstances in *Huerta-Contreras*. Unlike that case, which occurred in Marion County, the relevant events here occurred near "small towns" in Grant County and Malheur County that had populations of roughly 500 people. Although we did not consider the weather or geography relevant to our decision in *Huerta-Contreras*, those facts are relevant here. Specifically, defendant does not dispute that his relevant conduct occurred during the winter, after 3:00 p.m., outdoors, and during "slushy" and "snowy" conditions in a rural Oregon county.

Further, the majority concludes that, even if the truck had been stolen in the morning, McGourty did not encounter it until the afternoon and that "several hours [had] elapsed during which the vehicle could have changed hands." 344 Or App at 553-54. Based on this record, however, it is speculative, not reasonable, doubt that the truck could have changed hands between its theft from the Winegar property and McGourty's encounters with defendant. As noted above, the truck was stolen from and recovered near towns with populations of about 500 people. The theft occurred during "terrible" "wintery" weather when

people were not typically out and about. McGourty encountered the truck, defendant, and Sanchez on a dirt road that was a part of a cattle pasture—miles from the highway and not a typical road for travel—and defendant was a stranger in a small town at a time of year when strangers were not typically present.

The majority also relies in part on the fact that that the record does not contain evidence of "visible damage to the vehicle that defendant recognized as indicative of theft," such as to the "locks, windows, or ignition" to conclude that there was insufficient evidence to "establish that defendant knew the vehicle was stolen." *Id.* at 553. But UUV does not require that the vehicle have been "stolen" with smashing of glass or hotwiring ignitions as is commonly represented in movies or video games. It only requires that a person rode in a vehicle knowing that they did not have the owner's consent to do so. Indeed, there are many instances in which a thief may not need to cause any damage, let alone "visible damage," to a vehicle to steal it.

This is one of those instances. Winegar left the truck in his shop, unlocked, with the keys inside so that a mechanic could install injectors in his absence. In addition, law enforcement officers determined that, because the shop doors were still "intact and locked" and had not been "damaged," someone had "gained entry" to the shop "through th[e] window." When, as here, a vehicle owner stores the vehicle in a locked structure like a shop or a garage—rather than in a driveway or at a curb—and leaves it unlocked with the keys inside, the absence of visible damage says little about a defendant's knowledge as to whether he had the owner's permission to ride in the vehicle. So even without "visible damage *** indicative of theft," *id.,* the evidence here allowed the trial court to find beyond a reasonable doubt that defendant knew that he did not have the permission to ride in the truck.

In sum, several independent facts—considered as a whole—establish that defendant knew that he did not have Winegar's permission to ride in the truck. Those facts include: (1) Winegar was not present and neither defendant nor the co-defendant owned the truck; (2) the truck

carried industrial equipment, such as a plasma cutter, but the truck was not being used for industrial work; (3) despite the snowing and freezing conditions, defendant refused McGourty's repeated offers for help and to tow the truck to the highway, where defendant could have better contacted the person who was picking him up; (4) even though the truck was several miles from the highway, defendant abandoned it—again, after refusing McGourty's help—and instead walked toward the highway; and (5) defendant fled from law enforcement and hid for so long that he suffered hypothermia.[2]

Could there be innocent explanations for defendant's conduct? Yes. But just because I can imagine innocent explanations does not mean that the inferences of guilt here are impermissible or that the evidence was insufficient to support a guilty verdict. Importantly, when reviewing a motion for judgment of acquittal we consider the evidence in the light most favorable to the state, which means that we allow reasonable inferences to be drawn in the state's favor. *State v. Cervantes*, 319 Or 121, 125, 873 P2d 316 (1994). Moreover, the Supreme Court has explained that "reasonable doubt [does not] include[] imaginary doubt." *State v. Williams*, 313 Or 19, 40, 822 P2d 1006 (1992) (internal quotation marks omitted). Consequently, jurors are instructed that reasonable doubt is "based on common sense and reason. Reasonable doubt is not an imaginary doubt. Reasonable doubt means an honest uncertainty as to the guilt of the defendant." UCrJI 1009. Using common sense and reason to evaluate the evidence in this case, a factfinder could permissibly determine beyond a reasonable doubt that

---

[2] I also observe that the truck had a manual transmission, and the clutch was rendered inoperable, indicating that the person who drove the truck from the shop onto the dirt road in the cow pasture was completely unable to operate a manual transmission. It is a stretch to imagine that the owner of a work truck would permit someone who could not operate a manual transmission to use the truck to travel a long distance; indeed, they would not. And it is similarly a stretch to believe that someone could ride for any length of time in a work truck driven by a person who could not operate a manual transmission and not find it questionable that the driver was permitted to use that truck. Although the inoperable manual transmission fact is not dispositive, it is one more piece of evidence that indicates defendant knew he did not have the owner's consent to be in the truck.

defendant knew he did not have the owner's permission to be in the truck.[3]

Before I conclude, I make one final point about this case. If I were evaluating the evidence in the first instance, I would not place a great deal of weight on defendant's flight. Indeed, I do not agree with the expansive use of evidence of flight to prove that a defendant committed a charged crime. To be sure, a person may flee from law enforcement to avoid being caught for current criminal activity. But flight from law enforcement can reflect many considerations, including fear and distrust of law enforcement based on personal experience or community knowledge, a purely instinctual response to an overwhelming show of force, a fear of false accusations that could lead to legal consequences, guilt over an unrelated matter, fear of being apprehended for reasons unrelated to criminal conduct, or any number of reasons based on a person's lived experience that I cannot surmise. Without knowing precisely why a person might flee from law enforcement in any given interaction, it strikes me as a stretch to allow a factfinder to place much weight on that flight as evidence of the defendant's culpability of the charged crime. That said, our law permits such an inference, *e.g., State v. Minchue*, 173 Or App 520, 24 P3d 386 (2001), and *State v. Raney*, 331 Or App 693, 547 P3d 172 (2024)—unless we revisit those holdings. Accordingly, the trial court's use of that inference was permissible and supported its ultimate determination that defendant was guilty beyond a reasonable doubt of UUV.

In sum, although the trial court relied on inferences to determine that the state met its burden to prove that defendant knew he did not have the owner's permission to be in the truck, those inferences were permissible on this record. As a result, I would affirm the trial court's denial of defendant's motion for judgment of acquittal on the UUV charge. Because of that, I respectfully dissent.

---

[3] The Supreme Court has explained that "reasonable inferences" need not "follow *necessarily* from the state's evidence." *State v. Hedgpeth*, 365 Or 724, 732, 452 P3d 948 (2019) (emphasis added). Rather, "evidence may give rise to multiple reasonable inferences and * * * the choice between those reasonable inferences is a matter for the jury." *Id.*